### SUN OIL CO. et al. v. POTTER et al.
### No. 9448.

Court of Civil Appeals of Texas. Austin.

July 26, 1944.

Rehearing Denied Sept. 27, 1944.

Second Rehearing Denied Oct. 18, 1944.

Dissenting Opinion Oct. 27, 1944.

J. W. Timmins and Martin Row, both of Dallas, Powell, Wirtz, Rauhut & Gideon, of Austin, and Rex G. Baker and Nelson Jones, both of Houston, for appellants.

W. B. Harrell, of Dallas, Ernest Goens, of Austin, Grover Sellers, Atty. Gen., and E. R. Simmons and W. P. Watts, Asst. Attys. Gen., for appellees.

McCLENDON, Chief Justice.

Rule 37 case. The appeal is from a final judgment refusing to set aside a permit to drill two wells upon an 8.97-acre tract in the East Texas Oil Field in addition to the two producing wells already on the tract. The wells here involved are the same as those in Humble Oil & Refining Co. v. Potter, Tex.Civ.App., 143 S.W.2d 135, wherein the then authorizing permits were set aside on the ground that each permit was granted upon a separate voluntary subdivision of the 8.97-acre tract; whereas the right of the tract as a whole furnished the proper basis for determining the validity of the permits. The judgment cancelling the permits was without prejudice to the rights of appellants to apply for permits for additional wells upon the entire tract. The instant permit was later granted, authorizing the two wells in the same locations as those annulled in the above prior suit.

Ownership in fee of the 8.97 acres was in the Smith heirs (9 in number) prior to the discovery of the East Texas Oil Field (1930), at which time the surrounding contiguous lands were all owned by other parties. The tract was therefore entitled to development as a separate, detached tract. The history of the title in this respect is set forth in Sun Oil Co. v. Smith, Tex.Civ. App., 113 S.W.2d 683. The tract is located in the N.E. portion of the field. It is L shaped; the stem of which extending north-south is approximately 2,900 feet long, with an additional very narrow triangular strip extending northward from its north end. The 2,900-foot stem is about 150 feet wide at the north end and about 200 feet wide at the south end. The lower arm of the L extends east from the south end of the stem and is about 600 feet long by 60 feet wide. The Sun (Sun Oil Company) and the Humble (Humble Oil & Refining Company) own leases situated respectively east and west of the 8.97 acres. Other leases are to the north and south. The 8.97 acres was held in common ownership until July 18, 1934, when it was partitioned by consent decree into 9 separate tracts. August 3, 1934, the Sun brought a trespass to try title suit to recover the 8.97 acres, in which the Smith heirs recovered. This judgment was affirmed by the Texarkana Court (Sun v. Smith, above) and on March 23, 1928, application for writ of error was dismissed. While this suit was pending (March 3, 1936) the owners of Lot 8 brought suit in trespass to try title for Lots 1–7 and 9; and in the alternative for specific performance of an alleged contract to execute a mineral lease thereon. Nonsuit was taken in this case December 22, 1938. Meantime a receiver was appointed to take charge of all of the lots in the tract except No. 8, and upon application of the receiver permit was granted September 1, 1938, to drill a well (No. 2) located about 1,300 feet south of the south end of the stem on Lot No. 6. Permit was granted to drill the No. 1 well August 27, 1938, upon application filed April 12, 1938. This well is located on Lot 8 (not in receivership) about 800 feet south of the north end of the stem and about 800 feet north of well No. 2. Early in 1939 separate applications were made to drill a well on each of the other 7 lots (1–5, 7 and 9). These were granted except as to Lot 2, as to which it was denied. Four of these permits were set aside by the trial court and all by this court in the above case. The two permits allowed by the trial court were for wells located, one (No. 3) about 200 feet south of the north end and the other (No. 4) about 400 feet north of the south end of the stem. As stated these are the two locations here involved, authorized under a single permit subsequently granted.

The first point urged by appellants (Sun and Humble) is one of practice. It is to the effect that the permit was improperly granted without requiring that the 8.97 acres "be reconstituted into a common ownership tract as it was before subdivision, or that all affected owners either join in the application or otherwise indicate their assent in some binding way." The record facts follow: Potter and Birdsong made the application as operators to drill wells Nos. 3 and 4 on the 8.97-acre tract, naming J. R. Smith heirs as fee owners; the application showing that wells Nos. 1 and 2 had already been drilled on the tract. After the partition of July 18, 1934, the several owners leased the 9 lots by nine separate oil and gas leases of usual form for ten-year terms and thereafter as long as there was commercial production, retaining ⅛ royalty interest. At the time of the application all of these leases except that on Lot 8 were owned by Potter and Birdsong; and Birdsong owned a half interest in Lot 8. In the trial court Potter impleaded the fee owners and sought to have their rights adjudicated. Upon plea of privilege by the fee owners this phase of the case was transferred to Gregg County. While Sun and Humble appear to have excepted to the plea of privilege, no exception was taken by any party to the order of transfer. It has been ruled, whenever the question has been presented, that royalty owners are not necessary parties to a suit involving the validity of a drilling permit. Railroad Commission v. Shell, Tex.Civ. App., 164 S.W.2d 773; Shell Petroleum Corporation v. Railroad Commission, Tex. Civ.App., 137 S.W.2d 797; Railroad Commission v. Humble Oil & Refining Co., Tex. Civ.App., 101 S.W.2d 614. The lessees are invested with full control over the leased premises, including the right of possession and to develop and the incidental right to apply for the necessary drilling permits. These rights import corresponding duties of the lessees for breach of which they would be liable. The lessors had notice of the suit and evidently none of them desired to contest the validity of the permits. Their rights as between themselves, or between lessees and themselves were matters beyond the jurisdiction of the Commission. See Railroad Commission v. Miller, Tex.Civ. App., 165 S.W.2d 504, and cited cases. The Commission alone had authority in the first instance to determine 1) whether additional wells were necessary, and if so 2) their proper spacing. We think its authority in this regard was properly invoked.

The permits were granted to prevent both waste and confiscation of property.

As to the waste issue: there were no conditions peculiar to this tract that would warrant the exception. It was contended, however, that there was an area in the northern and another area in the southern portion of the tract which were so situated with reference to the surrounding wells as to require the two wells in question in the interest of proper development for greatest ultimate recovery. See Woods v. Humble Oil & Refining Co., Tex.Civ. App., 120 S.W.2d 464. Mr. Hudnall, the witness advancing this theory, conceded (as his map clearly demonstrates) that these areas are drained in accordance with the spacing pattern set by the rule (1 well to 10 acres), in that no portion of either area is more than 466 feet from a producing well. The holding in the Wood case is therefore not here in point.

As to confiscation: the record shows that with wells Nos. 1 and 2 the tract has an advantage both as regards density in the eight times surrounding area and the locations of the wells in that area; and that with wells Nos. 1 and 2 the net drainage is toward the tract and not away from it.

Appellees contend that the permittees are entitled to the two wells in question in order that the tract may equalize the per acre production of the Sun and Humble which had accumulated up to the time the permits were granted to drill wells Nos. 1 and 2. This contention is predicated upon the following quotation from our opinion in the prior case (Humble Oil & Refining Co. v. Potter, 143 S.W.2d at page 137):

"* * * The record in the instant case shows that the Sun, one of the appellants here, by suit wherein it claimed to own the leasehold on the 8.97-acre tract itself, prevented any development of this property until the latter part of 1938; that both the Sun and the Humble had, for many years prior thereto, through wells within drainage distance on each side of this strip of land, been extracting large quantities of oil from the pool. It was shown that the Humble has, up to May 1, 1939, extracted through wells on its adjoining 100-acre tract to the west, according to reports filed by it, 6,564 barrels per acre from beneath its tract; and that up to that time the two

wells finally drilled on the 8.97 acres had extracted only 350 barrels per acre therefrom. The Sun likewise had been producing for years from its lease adjoining the strip on the east, and had, through its suit against appellees, long delayed and prevented them from recovering any of the oil beneath their lands. It thus becomes manifest that the owners of the 8.97-acre tract have not been given a fair and equal opportunity with their neighbors to recover their fair share of the oil in place beneath their tract. Since all wells in this area were given the same daily allowable, their property rights, not taking into account any question of waste, a matter which the Commission must determine, could be protected in the light of these facts, by giving to them a greater density of drilling on their tract."

At the time that opinion was written it had been the uniform holding of this court that the Commission was without authority to grant a permit when there was a bona fide dispute over the title to the property. See Tide Water Oil Co. v. Railroad Commission, Tex.Civ.App., 76 S.W.2d 553; Altgelt v. Texas Co., Tex.Civ.App., 101 S.W. 2d 1104, 1105, error dismissed; Railroad Commission v. Magnolia Petroleum Co., Tex.Civ.App., 163 S.W.2d 446. In this last case this holding was expressly overruled (141 Tex. 96, 170 S.W.2d 189, 190), the Supreme Court holding that, in this regard, the spacing rule did not materially change the situation as it existed at common law. After stating that in reaching our above holding "it seems to have been erroneously assumed that such permit affirmatively authorizes the permittee to take possession of the land and drill," the Supreme Court say:

"* * * We do not think the permit has this effect. The function of the Railroad Commission in this connection is to administer the conservation laws. When it grants a permit to drill a well it does not undertake to adjudicate questions of title or rights of possession. These questions must be settled in the courts. When the permit is granted, the permittee may still have no such title as will authorize him to drill on the land. If other parties are in possession of the property, as in the present case, they may defend their possession by self-help, or by injunction proceedings. Before the permittee can drill, he must first go to court and establish his title. In that suit, upon proper showing, he may have a receiver appointed to drill the well and hold the proceeds to await the final judgment on the title issue. On the other hand, if he has possession, or can obtain possession peaceably, his adversary may resort to the courts for a determination of the title dispute, and therein ask for an injunction or for a receivership. In short, the order granting the permit is purely a negative pronouncement. It grants no affirmative rights to the permittee to occupy the property, and therefore would not cloud his adversary's title. It merely removes the conservation laws and regulations as a bar to drilling the well, and leaves the permittee to his rights at common law. Where there is a dispute as to those rights, it must be settled in court. The permit may thus be perfectly valid, so far as the conservation laws are concerned, and yet the permittee's right to drill under it may depend upon his establishing title in a suit at law. In such a suit the fact that a permit to drill had been granted would not be admissible in support of permittee's title."

The record does not show that there has been any prevention of development of the 8.97 acres other than that which might be implicit in the Sun's assertion of title thereto and prosecuting to final adverse judgment the suit to establish that asserted title. Under the above Supreme Court holding, such assertion of title and suit to establish it constituted no legal impediment to obtaining from the Commission the necessary permits for development; and the rights of the respective parties were the same as at common law in the absence of any spacing rule whatever. We do not understand that the mere assertion and prosecution of a claim of title to lands gives any right of action for damages (recoupment) against the claimant in favor of the ultimately adjudged true owner. It is true, of course, that such assertion of title and suit may constitute a serious impediment to profitable disposition of the land, or financing its development. But these are impediments which exist independently of any conservation laws; and the same legal remedies for their removal exist after as well as before such laws were passed or any spacing or other regulations were promulgated thereunder. The fact that an owner has been prevented by unfavorable or fortuitous circumstances from developing his property, creates in him no right of action against his neighbors, merely because they have profited by his misfortune. So long as they have done no act constituting an unlawful

interference with his rights, he can not hold them liable for the consequences resulting from his unfortunate circumstances. Had the Sun withheld from the true owners of the 8.97 acres its lawful possession, or restrained or otherwise prevented development through legal action, there would have, of course, arisen a legal liability for the injury inflicted by the unlawful infringement of legal rights. But even so, this would be a private matter between Sun and the owners, and not one that could be adjudicated by the Commission. Nor would permission to drill additional wells and thereby extract from the common pool in which others than the Sun have interests sufficient oil to recoup the loss be an appropriate remedy to satisfy a claim for injury inflicted by the Sun alone. The Humble, which is as vitally interested in the matter as the Sun, has been guilty of no wrong. This is likewise true of lessees to the north and south, though their interests may not be relatively so great.

Moreover, enforcement of the right of recoupment for past injurious action (if in fact it exists) is in its every aspect a judicial and not a legislative or administrative function. The Commission, in administering the conservation laws, deals with situations as they exist at the time its orders are made; and such orders are prospective and not retrospective in operation, just as are its orders in the field of rate making. See Missouri-Kansas & T. R. Co. of Texas v. Railroad Commission, Tex.Civ. App., 3 S.W.2d 489, affirmed Producers' Refining Co. v. Missouri, K. & T. R. Co. of Texas, Tex.Com.App., 13 S.W.2d 680; 42 Am.Jur., pp. 331, 332, § 39. The Commission has no strictly judicial functions, and only such quasi-judicial functions (such as fact finding), as are incidental to its properly delegated legislative and administrative functions. The legislature has no strictly judicial functions; and has no power to delegate to a board a function which it does not itself possess. For a discussion of this subject see 42 Am.Jur., pp. 329-331, §§ 36 and 38. Appellees cite the Marrs case (Marrs v. Railroad Commission, Tex.Sup., 177 S.W.2d 941) as sustaining their contention that the Commission may authorize recoupment for past inequalities in production by granting additional wells. We find nothing in the Marrs decision to warrant this conclusion. That was a suit to enjoin proration orders to prevent further drainage of plaintiff's properties.

A low pressure area had been created on properties of the defendants which under operation of the proration orders under attack caused drainage of plaintiffs' properties. It was to prevent this drainage, not to recoup for past inequalities, that the injunction was granted. It is true that the past history of the field's development and the effect of the proration orders upon production were reviewed; but there is nothing in the opinion of the Supreme Court to warrant the conclusion that the Commission was authorized in its future proration orders to allow recoupment for past inequalities; but only that the Commission's proration orders should afford the plaintiffs the right to extract their fair share of the recoverable oil (or its equivalent) underlying their land at the time the orders are made. We do not understand that the right of recoupment for past inequalities was raised or considered in the Marrs case. There is also this distinction between the Marrs and the instant case. There, the past inequality was due to the Commission's proration orders which had prevented and were preventing the plaintiffs from getting their fair share of the recoverable oil. Here, the only prevention asserted was due to the acts of one of the adjoining leaseholders. No act or refusal to act of the Commission or of any other leaseholder had any preventive effect.

This further circumstance demonstrates the purely judicial character of recoupment as a remedy for loss through past prevented production. Any proper criterion of recoupment must of necessity be based upon value of product and not its quantity alone. If defendants were entitled to recoupment in kind for the oil they were "prevented" from producing between August 3, 1934, and March 23, 1938, they would be entitled, and entitled only, to the quantity of oil equal in value to that which they were thus prevented from producing. A barrel of oil in 1935 may or may not equal a barrel of oil in 1944. If the price at a particular date in 1944 were taken, the relative values might, with reasonable accuracy, be calculated. But the recoupment in kind can not be thus accomplished but must be spread over a number of years in the future; and it is a matter of common knowledge that the price of oil has widely fluctuated in the past and is subject to wide fluctuation in the future. These circumstances further demonstrate that if the Commission had the power to make adjust-

ments for the purpose of recoupment, increase in the allowable and not the granting of additional wells would be the proper remedy. See Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069,.99 A.L.R. 1107, 101 A.L.R. 1393.

■ Aside from the above holding, and conceding (arguendo only) that recoupment through additional wells may be allowed by the Commission, the record we believe shows that recoupment in quantity has already been effectuated. The wells in this and adjoining leaseholds are all upon a 20-barrel per day allowable, and are allowed to produce 22 days per month. Wells Nos. 1 and 2 therefore produce 880 barrels per month. There are fourteen wells in the 8 times area which are allowed to produce 6160 barrels per month gross, or 770 barrels per month for the same area as the 8.97 acres. The latter is therefore producing 1,320 barrels per annum more than its fair share under this comparison.

The testimony of Mr. Heath shows (and the data upon which it is based are not questioned) that the accumulated per acre production of the Sun and Humble leases during the pendency of the Sun suit was 2,796 barrels. On the same basis the 8.97-acre tract was entitled to 25,380 barrels. The two additional wells had a yearly allowable of 10,560. If we add the 1,320 barrels per year excess which wells Nos. 1 and 2 were producing, we have 11,880 barrels. On this basis it would take only 2.13 years to effectuate recoupment. The first two wells have been producing since the fall of 1938 and all four since the fall of 1939. It is therefore manifest that recoupment was effectuated prior to January 1, 1942—more than a year before the case was tried. These figures are based upon the entire Sun and Humble leases. There was no showing of the exact production during the Sun suit pendency of the 8 times area. We have, however, made a computation which we think is more than fair to defendants, based upon the 8 times area. There are several factors which show this liberality which we think unnecessary to discuss in detail. As stated, the record shows that in comparison with the 8 times area the 8.97-acre tract was entitled to produce 770 barrels per month. The Sun suit pendency period was 43⅔ months; and the loss in production 33,623 barrels, to recoup which with the four wells would require only two years and nine months; which

time had elapsed several months before the trial.

Mr. Hudnall testified that with only wells Nos. 1 and 2 it would take 163 years to equal the accumulated production of the 8 times area. The data upon which this calculation was made is not shown. Based upon 1,320 barrels per year excess (and this figure is accurate), this would make the recoupment quantity amount to 184,160 barrels. There is nothing in the record to substantiate this figure. Mr. Heath testified that taking the entire per acre production of the Sun and Humble leases from the beginning through 1940 the recoupment period with only wells Nos. 1 and 2 would terminate in 1955. His data are not questioned. But, as stated, all four wells had been producing since the fall of 1939, and recoupment had been fully consummated prior to the trial.

■ One other issue remains, which relates to well No. 4. Appellees contend that this well is essential to prevent confiscation due to the fact that after both wells Nos. 1 and 2 shall have been drowned out by water encroachment there will still be a large quantity of oil under the southern portion of the tract to which appellees will be entitled, but which they can not recover unless well No. 4 is allowed. The facts in this regard show that the water encroachment is from the northwest and that under present trends wells Nos. 1 and 2 will eventually be drowned out before all recoverable oil shall have been exhausted from the southern portion of the tract. This situation is accentuated by the fact that there is a rise in elevation of the oil stratum from north to south. This difference in elevation, however, is only 4 feet between well No. 2 (-3225) and well No. 4 (-3221). If it be conceded that appellees will be entitled to this additional well after wells Nos. 1 and 2 have been drowned out, that fact would not justify the well at this time, and production thereunder for an indefinite number of years prior to the time it will be needed for this purpose. Just when the appropriate situation may arise is uncertain, in any event; and may also depend upon conditions unforeseeable at the present time.

The judgment of the trial court is reversed, the permit is cancelled and production thereunder permanently enjoined.

Judgment reversed; permit cancelled.

BLAIR, J., dissents.

On Separate Motions for Rehearing by Potter and by the Commission.

McCLENDON, Chief Justice.

In the motion of the Commission it is urged that our opinion in the former case (Humble Oil & Refining Co. v. Potter, 143 S.W.2d 135) is stare decisis and res judicata of the question of the power of the Commission, in passing upon the issue of confiscation, to take into consideration past production on the 8.97-acre tract in comparison with that on surrounding tracts; citing the following authorities: Nichols v. Dibrell, 61 Tex. 539; Freeman v. McAninch, 87 Tex. 132, 27 S.W. 97, 47 Am.St.Rep. 79; Rio Bravo Oil Co. v. Hebert, 130 Tex. 1, 106 S.W.2d 242; Federal R. Co. v. State, 128 Tex. 324, 98 S.W. 2d 993; Davis v. First Nat. Bank, 139 Tex. 36, 161 S.W.2d 467; Lamar, etc., v. Gordon, Tex.Civ.App., 158 S.W.2d 607, error refused; 26 Tex.Jur., p. 25. These authorities enunciate the elementary rule that a judgment is binding upon the parties to a suit of all issues that are raised and decided therein, and such issues cannot be relitigated by the same parties in a subsequent suit. It is clear from our former opinion that the only issue decided in that suit was that the several tracts in the 8.97 acres were voluntary subdivisions and could not be considered as separate tracts for deveolpment purposes, and that, in so far as the issue of confiscation was concerned, the sole question was whether the 8.97-acre tract was entitled to additional wells to protect vested rights. The following quotations from the opinion demonstrate the correctness of this conclusion:

"Appellees here urge that the evidence was sufficient to sustain an order granting two additional wells on the entire tract. This contention, however, overlooks the fact that the Railroad Commission has never determined, nor been asked to determine, how many wells, if the 8.97 acres be treated as one tract, are necessary to prevent confiscation on such tract; and if any are so needed, where they should be located thereon. These matters are delegated to the Commission for determination; and it is now settled that the courts are without authority to substitute their findings in such matters for those of the Commission, which, in the instant case, have not yet been made. Gulf Land Co. v. Atlantic Refining Co., supra [134 Tex. 59, 131 S.W. 2d 73]; Shell Pet. Corp. v. Railroad Com., Tex.Civ.App., 133 S.W.2d 194, writ refused.

\* \* \* \* \*

"Having concluded that the Commission granted all of said permits on untenable grounds and in violation of its own rule of May 29, 1934, relating to subdivisions; and that the only legal basis which could sustain, or would authorize, additional wells on the 8.97-acre tract was not considered nor passed upon by the Commission; it follows that all of said six permits so granted fall into the same category. The trial court was without power to substitute its findings for fact findings which the Commission had not made. The whole controversy should, therefore, have reverted to the Commission for a reconsideration thereof upon a proper basis. The two permits sustained by the trial court are set aside as invalid, and the cause reversed and remanded to the trial court for such further relief as may be appropriate; but without prejudice to the rights of appellees to again apply to the Commission for additional wells in accord with grounds above stated."

Since the former judgment is not res judicata of the question, the doctrine of stare decisis has no application. Furthermore, that doctrine only applies to questions determined by the Supreme Court, and no application for writ of error was applied for in the former case. See 26 Tex. Jur. p. 46, § 368.

The motions are overruled.

Overruled.

BLAIR, Justice (dissenting).

I respectfully dissent from the majority holdings herein. In substance the majority hold that in granting the permits for the two wells in question the Commission passed upon or determined an issue of recoupment of oil as between the parties, and passed upon or determined their legal rights and liabilities resulting from the delayed development of the 8.97-acre tract, because of the litigation over the title; that the Commission had no authority or jurisdiction to determine these legal or judicial questions; and that in consequence the permits for the two wells were void and should be cancelled.

It is my view that if the question of recoupment, or the other asserted legal issues or questions were ever involved or determined, the Commission did not deter-

mine them, but that this court determined them on the former suit and appeal (Humble Oil & Refining Co. v. Potter, 143 S.W. 2d 135), which was between the same parties to this suit and appeal, related to the same matters, and that therefore our former final judgment is res adjudicata of all such issues or questions in this particular appeal or suit. It is also my view that no issue or question of recoupment vel non was raised by the evidence, but that the sole issue determined was how many wells would, as of the date of the two permits or orders under attack, afford the 8.97-acre tract a fair and equal opportunity to recover the recoverable oil beneath it, or its equivalent in kind, during the remainder of the producing life of the particular area involved.

That this court determined and adjudicated the foregoing questions or such matters is conclusively shown by the quotation from our former opinion, at page 5 of the majority opinion herein [182 S.W.2d 926], as follows:

"* * * The record in the instant case shows that the Sun, one of the appellants here, by suit wherein it claimed to own the leasehold on the 8.97-acre tract itself, prevented any development of this property until the latter part of 1938; that both the Sun and the Humble had, for many years prior thereto, through wells within drainage distance on each side of this strip of land, been extracting large quantities of oil from the pool. It was shown that the Humble has, up to May 1, 1939, extracted through wells on its adjoining 100-acre tract to the west, according to reports filed by it, 6,564 barrels per acre from beneath its tract; and that up to that time the two wells finally drilled on the 8.97 acres had extracted only 350 barrels per acre therefrom. The Sun likewise had been producing for years from its lease adjoining the strip on the east, and had, through its suit against appellees, long delayed and prevented them from recovering any of the oil beneath their lands. It thus becomes manifest that the owners of the 8.97-acre tract have not been given a fair and equal opportunity with their neighbors to recover their fair share of the oil in place beneath their tract. Since all wells in this area were given the same daily allowable, their property rights, not taking into account any question of waste, a matter which the Commission must determine, could be protected in the light of these facts, by giving to them a greater density of drilling on their tract."

Obviously the Commission did not pass upon nor determine the foregoing questions or matters, but this court determined them. All the Commission could do and all it did do after our former judgment became final was to carry it out or to enforce it. The one matter left for the Commission to determine was how many wells on the 8.97-acre tract would afford lessees thereof "a fair and equal opportunity to recover their fair share of the oil in place beneath their tract," or its equivalent in kind. In determining this one matter we held that the Commission could consider the past production from the Humble and Sun adjacent leases in comparison with the production from the 8.97-acre tract, and could also consider the fact that the lessees had been delayed in the development of the 8.97-acre tract by the unwarranted title litigation, and that lessees "could be protected in the light of these facts, by giving to them a greater density of drilling their tract." We further held "that the owners of the 8.97-acre tract have not been given a fair and equal opportunity with their neighbors to recover their fair share of the oil in place beneath their tract." Our former holdings and judgment became final, no writ of error having been applied for. All parties thereto acted thereon, and lessees made application for and, after a hearing at which all parties to the former judgment were present and participated, were granted permits to drill the two additional wells in question. The courts determining the aforementioned matters were of competent jurisdiction, and our former final judgment is res adjudicata of all such matters, issues and questions.

The basis for the doctrine of res adjudicata is well stated in 26 Tex.Jur. 25-27, § 359, as follows:

"The doctrine of res judicata is founded in public policy, as being conducive to peace, repose and morality without working injustice. The good of society and the preservation of rights and order require that when once the claims of parties have been determined by the ultimate tribunal provided by law for their adjudication, the matter should pass from the field of strife forever. Any other rule would but fill the courts with causes which have been once determined and would render all rights of property uncertain and the most solemn judgments a mockery. There must be an end of litigation somewhere, and if parties were permitted to go behind solemn judgments after the issues have been settled by

trial, there would be no such thing as a final adjudication. Accordingly, it is the rule in Texas that when a case has once been tried and the issues duly disposed of, the litigation is ended."

Every, basis for the application of the doctrine of res adjudicata is present here. It is a matter of common knowledge that it requires a large outlay of money to drill oil wells, and due to the migratory nature of oil and the fact that oil fields are depleted within a few years, continuous diligence in development is essential to a full recovery of the oil beneath any tract of land. The parties to the former appeal obtained an adjudication of all the issues or questions with respect to the right of lessees of the 8.97-acre tract to as many wells as the proof might show necessary to accord the tract a fair and equal opportunity to recover the oil beneath it or its equivalent in kind. The foregoing facts bring the instant case within the settled rule that a judgment is res adjudicata not only of all matters actually determined, but of any related matter which the parties could have had litigated and decided in the cause. Foster v. Wells, 4 Tex. 101, 104; Nichols v. Dibrell, 61 Tex. 539, 541; Freeman v. McAninch, 87 Tex. 132, 27 S.W. 97, 47 Am.St.Rep. 79; Moore v. Snowball, 98 Tex. 16, 81 S.W. 5, 66 L.R.A. 745, 107 Am. St.Rep. 596; 26 Tex.Jur., 135, § 418.

The majority hold, however, that our former opinion and judgment were overruled by the Supreme Court in Railroad Commission v. Magnolia Petroleum Co., 141 Tex. 96, 170 S.W.2d 189, wherein that court overruled the long standing "uniform holding of this court that the Commission was without authority to grant a permit when there was a bona fide dispute over the title to the property." The Magnolia case was decided long after our judgment on the former appeal became final, and was in a different cause between different parties. In consequence, if the decision had the effect of overruling or changing the rule announced in our former judgment herein, which it did not, it could not control here, because neither the Supreme Court nor this court may by a change in or reversal of a former rule of law deprive litigants of the rights they have obtained by final judgments under the former rule. Clearly a court may not by a change or reversal of a former rule of law set aside or deprive litigants of the rights obtained under final judgments based upon the former

rule. As concerns final judgments based upon an existing rule of law the court may not by changing or setting aside the former rule in another proceeding between different parties and in different cases destroy the rights of the parties obtained under the former final judgments. Judgments reversing a former rule of law do not apply retrospectively to final judgments under the former rule. The changed rule must apply only prospectively, otherwise it would be unconstitutional.

The majority opinion alludes to the fact that Humble was not a party to the title suit, which delayed the development of the 8.97-acre tract. It was, however, a party to the former suit and appeal and is bound by that judgment. Nor is the fact that Humble was not a party to the title suit material. Humble was not deprived of developing its lease by that suit. It has developed and fully produced its lease. It has recovered all the oil to which it is entitled from its lease or the common pool. It cannot urge the point that it was Sun alone who filed and prosecuted the unwarranted title suit, thereby depriving lessees of the 8.97-acre tract under the rule that the Commission had no authority to grant permits for wells where a bona fide title dispute existed. Humble cannot under any rule of right, equity or fair dealing take advantage of the "unfavorable or fortuitous circumstances," which the Sun alone created by its unwarranted title suit, preventing lessees of the 8.97-acre tract from developing it. If this were true Humble would be permitted to recover oil to which it was not entitled, because of the "unfavorable or fortuitous circumstances," which Sun created by filing its unwarranted title suit.

We clearly held on the former appeal that lessees of the 8.97-acre tract had been delayed in the development of the tract by the unwarranted suit of Sun, and that the Commission might protect lessees "in the light of these facts, by giving to them a greater density of drilling on their tract," or by granting them more wells. We also held that the two wells on the 8.97-acre tract were not shown to be sufficient to afford lessees a fair and equal opportunity to recover their fair share of the oil beneath the tract. These holdings and the judgment are res adjudicata of all such matters, and announce a sound procedure for determining the correlative rights of adjacent owners or lessees of land to de-

velop them for oil under the conservation laws. Any question of delay in development of a lease is one of fact and is always incidental to the legal right of the owner to a fair and equal opportunity to development of his land for oil. The Magnolia case, supra, does not hold to the contrary, but merely holds that the Commission may grant a permit to the one it thinks owns a tract of land, even though the title thereto is in litigation. The question of delay in development is not a legal question, but one of fact which the Commission may take into consideration in adjusting the correlative rights of adjacent lessees to develop their lands for oil.

Nor was there any issue of recoupment as between any parties to this suit under the facts. The permits here under attack were granted on December 23, 1940, after a hearing on December 20, 1940. Under settled court rule the correlative rights of the adjacent owners or lessees here involved must be determined as of the date of such orders. Appellants' witness Heath testified that up to and including December, 1940, the 8.97-acre tract and the tracts in the eight times surrounding area had each maintained at all times as much oil in place as originally underlay them so that no loss had occurred as the oil was being produced; and that there had been no net drainage of oil as between these tracts up to and including the date of the order under attack. In consequence no possible issue of recoupment could have arisen as of that date. The sole question for the Commission to determine as of that date was how many wells on the 8.97-acre tract, considered as a whole, would afford it a fair and equal opportunity along with the tracts in the eight times area to recover the oil to which it was entitled, or its equivalent in kind during the remainder of the producing life of the area involved. The question of delay in development of the 8.97-acre tract was merely incidental to its legal right to sufficient wells to afford it a fair and equal opportunity to recover its recoverable oil or its equivalent. In so administering its spacing rule to afford enough wells to recover the recoverable oil or its equivalent in kind on the tract, the Commission acted as it has always done where a lessee or owner has been prevented through no fault of his own from the development of his tract until after production has taken place on adjacent tracts or leases. It is a matter of common knowledge that all wells on different tracts or leases in any given field or area have not been drilled at the same time and started in the race of production at the same time. Yet the Commission has always taken such delay or difference in time of development into consideration, and under its duty to adjust the correlative rights of adjacent leases, has from time to time granted wells to each tract or lease so as to afford it a fair and equal opportunity to recover the recoverable oil underneath it, or its equivalent in kind. And regardless of the reasons for delay in the development of the 8.97-acre tract, appellees were entitled to a fair chance to recover the oil under their land, or its equivalent in kind.

Under the conservation laws, the rules and regulations promulgated by the Commission for the production of oil, and the court decisions construing them, the Commission has the authority to and it is made its duty to make initial determinations with respect to the correlative rights of adjacent owners or lessees of lands to develop them for oil. The well spacing rule is the only method adopted by the Commission for the determination of such correlative rights and to adjust them. As made and enforced the spacing rule has been interpreted to mean that the Commission will and must grant to each owner or lessee of land sufficient wells thereon to afford him a fair and equal opportunity to recover the recoverable oil beneath his land or its equivalent in kind. The term "equivalent in kind" means oil and not damages in lieu thereof. In consequence there is no merit to the suggestion in the majority opinion that an owner or lessee must resort to the courts for damages in lieu of the oil beneath his land or its equivalent, where through no fault of his own he has been delayed in the development of his land until after production has taken place on adjacent lands. To compel him to resort to the courts for damages in lieu of his oil, because an adjacent landowner or lessee by unwarranted title suit or for any other reason delayed the development of the tract, would render ownership of oil lands extremely hazardous. Proof of such damages would be most difficult to make. The grave difficulties as to proof of the "proper criterion of recoupment" damages pointed out in the majority opinion would be multiplied in a suit for damages in lieu of oil. The whole purpose of the law of ownership is to afford an owner the right to recover the oil

beneath his land, and the purpose of the conservation laws is to permit owners or lessees of land to recover the oil beneath them in an orderly manner and so as to not cause waste. To compel resort to the courts to adjust correlative rights of adjacent lands for development for oil would multiply litigation and would simply divide the initial administrative duty of the Commission under the conservation laws with the courts. Particularly, no such resort to the courts for damages in lieu of the right to drill for and recover the oil beneath the 8.97-acre tract should be required in the instant case, because the undisputed evidence showed that each of the tracts in the area involved still had in place as much oil as originally underlay it, and that there had not been any net drainage as between the tracts up to the time the orders under attack were made. The Commission simply determined that as of the date of the orders in question the 8.97-acre tract was entitled to two additional wells to afford the owners or lessees a fair and equal opportunity to recover the recoverable oil beneath it or its equivalent in kind, during the remaining life of the field or area. Such orders deprived appellants of no property rights, because there is no dispute that their wells, which produced for more than four years prior to any production on the 8.97-acre tract, and which had produced up to the date of the orders, will produce in the future all of the oil beneath their lands or its equivalent in kind. And, independently of any question that our former judgment is res adjudicata of all of the forementioned issues or questions, the far better rule was announced by this court on the former appeal in this case. That is, the Commission may take into consideration the past production from the Humble and Sun leases in comparison with the production from the 8.97-acre tract, considered as one tract, and may take into consideration the fact that the lessees had been delayed in the development of the 8.97-acre tract by the unwarranted title suit of Sun, and to then grant such additional wells as were necessary to afford the tract a fair and equal opportunity to recover the recoverable oil beneath it or its equivalent in kind. Such proceedings are purely administrative, and relate to matters over which the Commission has full power and authority to act under the conservation laws. And, regardless of the reasons for the delay in drilling the 8.97-acre tract, it is entitled to a fair chance to the oil beneath it or its

equivalent in kind, and both the Commission and the trial court, considering or trying the matter de novo, found that two additional wells were necessary to afford the tract that chance; and they further found that the granting of the wells would not cause waste, and would not deprive appellants of any rights to recover the oil under their leases.

The majority hold ("arguendo only"), however, that the two wells already on the 8.97-acre tract had under the evidence as a matter of law recouped in quantity all the oil lost by delayed development resulting from the unwarranted title suit. It is my view there is substantial evidence sustaining the findings of both the Commission and the trial court, trying the case without a jury and de novo, that the two wells in question were necessary to afford appellees a fair and equal opportunity to recover the recoverable oil under the 8.97-acre tract or its equivalent in kind. At most the evidence was conflicting on the issue, and the findings by the triers of fact are conclusive upon this, an appellate court.

The permits under attack were granted on December 23, 1940, after a hearing held on December 20, 1940, and the respective rights of the parties to develop their adjacent leases must be determined as of the date of the orders granting the permits. The leases involved were located on better structure than the average of the East Texas field, and the 8.97-acre tract and the eight times area surrounding it had as much oil in place at the time the permits were granted as originally underlay them, although large amounts of oil had been produced from the Humble and Sun leases both before and after proration became effective. Both the Humble and the Sun leases were developed and oil produced therefrom beginning shortly after the East Texas field was discovered. The first two wells on the 8.97-acre tract were drilled in 1938. Thus the Humble and the Sun leases had been producing oil some four or more years prior to the time the first two wells were drilled on the 8.97-acre tract. Appellants' witness Heath testified that during the period from the date of production up to and including December, 1940, the entire eight times area involved had maintained its original amount of oil in place, and that there had been no net drainage as between the leases in the eight times area at that time. The evidence showed the amount of oil that had been produced on the Humble

and Sun leases as well as on the 8.97-acre tract through December, 1940. Using these production figures supplied by witness Heath, witness Hudnall made elaborate and clear calculations (pp. 73, 74, 75, 82, 83 and 84 S.F.), showing that with only the original wells Nos. 1 and 2 on the 8.97-acre tract, it would require 163 years for the production from the 8.97-acre tract to equal the accumulative production from the wells on the eight times area surrounding. Witness Heath testified that the life of production from the 8.97-acre tract and the eight times area was from 13 to 15 years, and that the field and area would be depleted by the year 1955. This testimony alone sustains the findings and conclusions of the Commission and the trial court that the two wells were necessary to afford the 8.97-acre tract its fair share of the recoverable oil from the area.

By using the testimony of witness Heath and Hudnall and referring to appellants' Exhibit 13, a much simpler method and one that is much more favorable to the appellants results, as follows: the eight times area surrounding the 8.97-acres tract, in outline in red on Exhibit 13, shows that all of the eight times area is within the Humble and Sun leases, except a strip of 355.9 feet wide in a north and south direction by 1488 feet long in an east-west direction, and a strip lying in the northeast portion of the easternmost part of the eight times area, being 355.9 feet wide in an east-west direction and 422.9 feet long in a north-south direction. The total area of these two strips comprises 680,089 square feet, or 15.61 acres. All of the production from the Sun Company's lease is obtained from the eight times area since all of their wells are located within the eight times area. Heath's testimony showing Humble's production of 892,857 barrels through 1941 allocated on a per well basis among 18 producing wells, shows an equivalent of 49,603 barrels per well produced during the period. Humble's wells Nos. 2, 3, 4, 6 and 19, a total of 5, which fall within the eight times area, have produced on a per well basis five times 49,603 barrels per well, or a total of 248,015 barrels.

The Sun-Reppond lease through 1941 had produced 370,956 barrels. By combining the Humble 248,015 barrels and the 370,956 barrels produced by Sun, we have a total of 618,971 barrels for these two leases within the eight times area produced during the period from the beginning of production through December, 1941. The eight times area comprising 71.76 acres less the 15.61 acres above calculated as lying outside of these two leases, but within the eight times area, leaves 56.15 acres in the Humble and Sun leases within the eight times area on which are located all of their wells that produced the above calculated amount of 618,971 barrels, which, divided by 56.51 acres (comprising Humble and Sun acreage in the eight times area), equals 11,024 barrels per acre. The applicant's area of 8.97 acres times the production of barrels per acre of Sun and Humble leases in the amount of 11,024 barrels equals 98,885 barrels that he would be entitled to have produced up through 1941. Mr. Heath's testimony shows that the 8.97-acre tract with two wells producing had produced 20,798 barrels through December, 1940, and that the yearly allowable of each well was 5,025 barrels, which times two wells equals 10,050 barrels for the production in 1941, which plus the 20,798 barrels makes a total production of 30,848 barrels produced by the two wells through December, 1941. Deducting this from the 98,885 barrels produced by Sun and Humble wells, in the eight times area, leaves a deficit of 68,037 barrels on January 1, 1942.

At the rate of gain of 1,320 barrels per annum with the two wells producing, it would require 51.6 years for appellant to gain back this amount. Heath's testimony shows that the 8.97-acre tract with all 4 wells producing, produced 48,981 barrels through 1941. Deducting this from 98,885 barrels, leaves a deficit of 49,904 barrels on January 1, 1942.

At a rate of gain of 1,320 barrels per annum, with the two wells producing, it would require 37.8 years for applicant to gain back this amount.

In addition, the Glasscock Well No. 1, and Champlin and Bass Well No. 2 on the Maddox lease, were early completions and would have to be added to the production from the eight times area, thus increasing the total per acre recovery within the eight times area and extending the period of time required for two wells to catch up with the deficit in production.

Witness Heath testified that the life of the 8.97-acre tract was 12 or 13 years and that it would be taken by water by 1955, and further testified that it would be past 1955 before the 8.97-acre tract would catch up in production with the Sun and Humble leases considered as a whole.

It may be noted here that witness Heath in testifying as to when the 8.97-acre tract would catch up in production with the Humble and Sun used as a method for his calculation the per acre production of the Humble-Willingham tract and the Sun-Reppond tract as compared to the total production per acre from the 8.97-acre tract, and that in so doing, his accumulative barrels per acre production from the Humble and Sun leases was reflected on the entire leases of Humble and Sun and not on the acreage falling within the eight times area. This, of course, would make a substantial difference in the per acre recovery and would automatically extend the time within which the 8.97-acre tract would catch up to a period long after 1955.

Witness Heath testified that from the southernmost well on the 8.97-acre tract (Well. No. 1) to the south line of said tract is a distance of 1,280 feet, and that from the west line to the east line of the L shaped portion out of the southern end of the tract is a distance of 775 feet. The undisputed testimony of witness Hudnall shows that the north end of the 8.97-acre tract would be flooded with water from 5 to 10 years prior to the flooding of the south end of the lease, due to the fact that the south end is 28 feet higher on the structure.

Thus, we find that from appellants' own witness Heath's figures of production from the adjacent lease of Sun and Humble and the undisputed testimony of witness Hudnall, based upon Heath's figures and Exhibit 13, that computed under one method it would take 163 years for the 8.97-acre lease to equal the accumulative production of the eight times area; and that, computed upon another method also using Exhibit 13, it would require 51.6 years for the two wells to catch up with the eight times area, and that with 2 wells and in addition to gains through the 2 wells through 1941, producing under the same method, it would require 37.8 years for them to gain back their fair share of the production. This undisputed testimony and evidence considered with reference to witness Heath's testimony that the leases would be depleted in 1955, makes it apparent on its face that the leasehold can never recover its fair share of recoverable oil unless the two permits in question are upheld.

The calculation in the majority opinion shown on page 10 thereof is based upon a conclusion that the production from the Humble-Sun leases from the beginning of the field through the middle of 1938 was on a 20-barrel per well basis. From the beginning of the field and for several years thereafter the per well allowable in the East Texas field was greatly in excess of 20 barrels per well, which is borne out by the fact that the computation is not consonant with the production figures given in the testimony of witness Heath showing a total production from these leases as reported to the Comptroller. The completion dates as shown by such reports were taken into consideration by Hudnall in determining that it would require 163 years for the 8.97-acre tract to catch up with the eight times area. Furthermore, the majority used the per acre recovery figure of 2,796 barrels on the Sun and Humble leases during the pendency of the Sun suit, instead of the per acre recovery of the eight times area.

Manifestly, the production comparisons made between the eight times area and the 8.97-acre tract should be given the same consideration when dealing with the question of equal opportunity as would the density comparison made by appellants.

The judgment of the trial court should be affirmed.