Ernest S. Goens, State's Atty., of Austin, for the State.

GRAVES, Judge.

Relator was charged by complaint in the justice court of Nueces County with the offense of murder. Upon an examining trial, after hearing evidence, he was remanded without bail to the custody of the sheriff to await the action of the grand jury. He, thereafter, made application to the district judge for a writ of habeas corpus, which was granted, and, upon the hearing of such writ, bail was again denied him, and he appeals.

■ There was an agreement by and between relator's attorneys and the State that the testimony taken on the examining trial in the justice court, and which was in writing, should be used in its entirety in this present case, and we find same in this record, filed as a statement of facts. This ·statement is entirely in question and answer form, in the first place, and again same is not approved by the trial judge, and same has no file mark thereon evidencing the fact that it was filed in the court below. Under this array of objections thereto we are convinced that such a purported statement of facts should not be considered by this court. See Art. 760, Subdiv. 1, Vernon's Ann.C.C.P., and note 23 thereunder.

■ There being no statement of facts before this court which we can consider, it will be presumed that the judgment remanding relator without bail was supported by the evidence and in accordance with law. Ex parte Adams, Tex.Cr.App., 13 S.W.2d 842; Ex parte Welburn, 70 Tex.Cr.R. 464, 157 S.W. 154; Ex parte Wair, 130 Tex.Cr.R. 204, 93 S.W.2d 160.

The judgment of the trial court is affirmed.

On Motion for Rehearing.

Since writing the above opinion, relator has furnished this court with a statement of facts in narrative form, properly approved by the trial judge, and filed in proper time, and we now consider the same.

■ Under the facts herein shown we are of the opinion that relator is entitled to bail, and this cause is therefore reversed and bail fixed in the sum of Ten Thousand Dollars, to be conditioned as required by law.

RAILROAD COMMISSION et al. v. MACK-HANK PETROLEUM CO.

No. 9469; Motion No. 10139.

Court of Civil Appeals of Texas. Austin.

Jan. 3, 1945.

Rehearing Granted in Part and in Part Denied March 7, 1945.

352

Grover Sellers, Atty. Gen., and Geo. W. Barcus, E. R. Simmons, and Fagan Dickson, Asst. Atty. Gen., for appellant Railroad Commission of Texas.

Black, Graves, & Stayton (by John W. Stayton), of Austin, for appellant W. R. R. Oil Co.

Vinson, Elkins, Weems & Francis, Raybourne Thompson, and Chas. I. Francis, all of Houston, for appellee Mackhank Petroleum Co.

McCLENDON, Chief Justice.

Oil proration case. The suit was by MPCo. (Mackhank Petroleum Company) against the Commission (Railroad Commission of Texas) to set aside an order of the Commission dated March 17, 1944, prorating for the month of April, 1944 (by amendment a like order for May, 1944, was added), the allowable allocated to the New Refugio Field in Refugio County. The proration was upon a per well basis of 57 barrels per day per well, with seven shut down days per month, but allocating to one well (No. 2) of the WRR (W. R. R. Oil Co.) 58 barrels per day, and exempting WRR wells 2 and 3 from the shut down order. WRR intervened as a party defendant. The suit was brought both as an appeal from the order under Vernon's Ann. Civ.St. Art. 6049c, § 8, and as an independent suit in equity. The trial was to the court, and the judgment was in favor of MPCo., cancelling the order and enjoining its enforcement and the making of similar orders in the future. The Commission and WRR have appealed.

The record does not show either the dimensions of the New Refugio Field nor whether its producing sands constitute a common pool with other adjacent fields. It has two sands at approximately—4900 (below sea level) and—6200 feet. Whether these two sands are connected is not shown. The field has 93 wells of which 33 are in the—6200 ft. and 60 in the—4900 ft. levels. The WRR lease covers the river bed of Mission River, with a producing area of about 6000 linear feet. It traverses the MPCo. lease for about 5000 feet.

These figures are taken from scaling the MPCo. map copied in part below. The MPCo. lease covers a tract which, with inclusion of the river bed, embraces 217 acres. It has 15 wells, Nos. 1 to 19, inclusive, excepting Nos. 8, 9, 12 and 17 which were never drilled. The location of these latter wells or why they were never drilled is not shown. The following map, which is a portion of the structural map introduced by MPCo., shows an outline of its lease and that of the WRR, the location of wells thereon and on the immediately adjacent lands:

The MPCo. lease (originally in the name of South Oil Corporation) covers the Fannie V. W. Heard tract. The productive portion of the WRR lease is shown by the dotted lines on either side of the river bed. The following figures are taken from testimony of an MPCo. witness: He estimated the width of the river bed at about 140 feet, the area traversing the MPCo. lease at about 14.6 acres, and the total productive area at about 17 acres. No field notes or survey of the river bed was shown, and these figures were deduced from scaling (by the witness) of the map, and an esti-

mate from observation only of the width of the river bed. If this figure (140 ft. wide) is correct, it would give 311 linear feet to the acre (43,500÷140=311) or 19.3 producing acres of which 16.08 would traverse the MPCo. lease. Deducting the river bed area from the MPCo. lease would therefore leave a total acreage of from 200.92 to 202.4. This witness testified, however, that the ends of the lines AA and BB marked the limits of the productive area. He testified specifically to a small triangle (see dotted line in map) in the southern extremity of the MPCo. lease which was not productive. The map shows that there is a large area (probably 100 acres) in the southern portion of the MPCo. lease that is wholly undeveloped, most of which is beyond the south ends of lines AA and BB. The MPCo. wells were all brought in between 1934 and 1937, there being no subsequent development of the lease. The WRR wells were brought in in 1938, No. 2 in July, No. 1 in August, and No. 3 in September. The spacing rule in effect in the field from the beginning has been a minimum of 300 ft. between wells and 150 ft. from property lines, generally referred to as the 2½-acre pattern, although in fact it gives a pattern of only a shade over 2 acres. This witness testified that one well would effectually drain from 15 to 20 acres; however, no effort had ever been made to have the area of the spacing pattern increased. He testified that the sands in the field were what is known as "blanket type," uniform and of good porosity and permeability; varying in thickness from 60 to 80 feet, with 25 feet saturated with oil. He estimated that the WRR lease contained 262-acre feet and the MPCo. lease 4,323-acre feet of productive sand, with approximately 700 bbls. of recoverable oil per acre foot. We are unable to reconcile these figures. Assuming the acreage he used for the WRR at 17 (his maximum) the sand thickness would be only 15.4 feet, and assuming he used his 14.6 acreage, the sand thickness would be 18 feet. There was no showing that the sand thickness on the WRR lease was less than that on the MPCo. lease. The indication is to the contrary. Applying these thicknesses to the MPCo. lease would give respective acreages of 280 and 240; each far in excess of the actual acreage without any deduction for river bed or nonproductive area. The lift pressure of the field was from water drive, from all sides toward the center of the field. While the evidence showed a drainage toward the portion of the WRR lease in which its 3 wells were located, it also showed that these wells were offset by MPCo. wells; and there was no showing whether this drainage was compensated by drainage to MPCo. lease from adjacent leases. Other evidentiary matters will be stated in connection with the several contentions considered.

The order appealed from is attacked upon these three grounds:

1. As being violative of the Commission's own rules applicable to this section of the state, which provide for a potential and not a per well allowable.

2. As being discriminatory and confiscatory in favor of WRR and against MPCo. based upon relative reserves and acre feet of producing sands.

3. As being further so discriminatory and confiscatory in allowing WRR well No. 2 a 58-bbl. per day allowable and in exempting its wells 2 and 3 from the seven-day monthly shut down orders.

As to ground 1: There was introduced a general order of the Commission, applicable to fields in this section of the state (Southwestern Texas District), the pertinent portions of which are:

"Rule 1. (a) The daily potential production of a lease or property is the amount of oil the wells on said lease or property are capable of producing during a period of twenty-four (24) hours if pumped or if operated naturally under the usual methods."

The rule then details the method by which this daily potential is to be ascertained.

"Rule 3. The daily amount of oil to be produced from each individual lease or property during a given proration period as defined by order of this commission shall be the proportion of the total allowable daily production from the fields of said district that the daily potential production of such lease or property bears to the daily potential production of the fields of said district determined for such period under the above provisions hereof."

It is to be observed that the potential of a given lease is based upon the capacity production of the "wells on said lease." This takes no account of producing acreage, acre footage or the reserves

in the lease, as such; potential being the actual capacity production, determined by test. The record shows, without conflict, that the potential rule had never been applied in the fields in this section of the State (with a few exceptions of no importance here), and especially had never been applied to the New Refugio field; but that the per well basis had been applied to that field from its inception, without protest or objection from any source. Under these circumstances it was incumbent upon MPCo. to apply to the Commission to have the applicable well potentials taken, and apply thereto the general potential rule, before applying to the courts for relief.

 It is the contention of MPCo. in this regard that (1) the Commission is bound by its own rules, and (2) where an order is made violative thereof it is not necessary to seek relief from the Commission by rehearing or otherwise, before applying to the courts. As general rules these two propositions are sound. But where, as here, it is shown that the rule contended for has never been applied to the field in question, but the rule or basis in vogue has been applied from the beginning and over a long period of years, without protest or objection, and acquiesced in by all interested parties, and where additionally, in order to apply the asserted rule actual tests would have to be made as an essential basis therefor, and no tests have been made or applied for; resort to the courts, without first applying to the Commission for relief, is premature.

Additionally, there is no showing whatever, in the record, as to what effect application of the potential rule would have upon the rights of MPCo. And certainly where no injury is shown complaint is without substantial basis of support.

Appellants contend: that the rule as written provides for a total daily allowable to all the fields in the district allocated among all the wells in the fields in the proportion that the potential of each well bears to the combined potentials of all wells in the fields, in the district; that it was made at a time when there was not a great deal of production in the district; that it long since became a dead letter due to the increased development and production in this area, which required a field, and not a district allowable; and that if the rule contended for were applied it would reduce the allowable of the MPCo.

lease to only a few barrels per day and below an amount that would make operation profitable. There was evidence supporting these contentions and none to the contrary. They furnish, if need be, an additional ground for requiring application to the Commission for relief before resorting to the courts.

The second ground challenges the per well basis of allocation as discriminatory and confiscatory as between the MPCo. and WRR in favor of the latter. This ground is predicated upon asserted disparity in productive area, in per acre footage of productive sands and in reserves between WRR and MPCo. As has been seen the evidence upon this score is far from satisfactory. We assume, arguendo, that it was sufficiently shown that a substantial disparity in these regards existed. We overrule this ground for three reasons: (1) Waiver or estoppel by contract between predecessors in title of the two leaseholds; (2) failure of MPCo. lessees to avail themselves of self help afforded by the spacing rule; and (3) failure to show that any drainage in favor of WRR was uncompensated.

 As to reason (1), the relevant facts are: As stated all the development on the MPCo. lease was completed in 1937. Some time prior to October 5, 1937, Wertheimer applied to the Commission for permit to drill nine wells on "66.3 acres Mission River through the Refugio Town Tract Survey" as exceptions to Rule 37 "to prevent confiscation of property." The record does not show boundaries of this lease, but it appears that all these locations except No. 1 were within the portion traversing the Heard tract and as offsets to wells on that tract Nos. 13, 18, 3, 17, 2, 4 and 6, the all over distance between Nos. 2 and 9 being 3139 feet. On May 31, 1938, before any of these wells was drilled, an agreement was executed by Mrs. Heard. SOCo. (South Oil Co., predecessor in title of MPCo.), the Town (Town of Refugio) and Wertheimer (predecessor in title of WRR). It recited that Mrs. Heard, as lessor, SOCo., as lessee, and the Town and Wertheimer, were claiming ownership of the minerals lying under the bed of Mission River traversing the Heard tract; and that, without waiver by any of the parties' claims of title to the river bed, the agreement was "for the purpose of settlement and compromise." It provided that Wertheimer "will drill not more than

three (3) producing wells in said river bed as it runs through said lease." The locations of these wells were designated on a map attached to the agreement as an exhibit, not shown in the record, but manifestly the locations were those shown on the above map. An overriding free royalty of 6/32 of the production of these wells was granted 7/8 to SOCo. and 1/8 to Mrs. Heard; with the proviso that this overriding royalty was to be increased to 8/32, similarly divided of all production in case Wertheimer was required to drill additional wells or respond in damages in order to hold his lease. These wells were to be bottomed under the river bed at the designated locations, but Wertheimer was accorded the right to drill them directionally from locations on the Heard tract adjacent to the river bed. He was also given the right of ingress and egress over the Heard lease for that purpose, and also the right to use the surface area of the lease for storage and piping purposes. Wertheimer then applied to the Commission for the three wells in lieu of the nine previously granted him; which application was granted and the previous (9-well) permit was cancelled. These three wells were brought in as stated in July, August and September, 1938. The benefits and obligations of this agreement by assignment passed to and were imposed upon MPCo. and WRR, respectively. While the parties could not, by private agreement, circumvent or limit the powers and duties of the Commission in administering the conservation laws (an issue foreign to this case, since the agreement was acquiesced in by the Commission, and no complaint against it has ever been or is voiced by the Commission) it was binding between the parties as regards their correlative rights. It set up a spacing pattern in a field which, at the time, always prior thereto, and ever since, has been prorated on the per well basis. MPCo. (and its grantors) have always shared in the production under that spacing pattern, and in accordance with that agreement, and presumably are amply compensated for any inequality in withdrawals from the common pool, under that pattern and under the proration basis then or thereafter applied to the field as a whole. They are not entitled to any exception to the general basis in order to equalize any disparity in production relatively between the MPCo. and WRR leases. This holding is, of course, independent of MPCo.'s

right to apply to the Commission for change of the entire field basis of proration from per well to potential, considered above.

■ As to the second reason, the record shows conclusively that from the time the three wells on the WRR lease were drilled, at least up to the time the federal government imposed war restrictions on drilling, a period of three or more years, MPCo. and its assignors have been free to avail themselves of self help by drilling under the prevailing spacing pattern such wells as they might deem appropriate to protect the lease from undue drainage. That this situation is a complete answer to MPCo.'s asserted right to have the proration formula changed in order to prevent disparity in withdrawals between it and WRR was held by this court in the Marrs case (Railroad Comm. v. Marrs, 161 S.W.2d 1037). In reversing the judgment of this court, the Supreme Court (Marrs v. Railroad Com., 177 S.W.2d 941) did not question the soundness of this general principle, but held that it did not apply in that case because the record there showed that prior to proration Marrs had availed himself of self help, but that proration had created a situation which rendered his self help wells ineffectual, and subsequent to proration he had been diligent in his efforts to develop his properties with a view of counteracting the undue drainage caused by proration. There is no analogy between the situation there and that here. Aside from the fact that the spacing pattern here was created, or in any event voluntarily acquiesced in, by contract of the parties, there is a total absence of any efforts at self help on the part of MPCo. This holding is also supported by Humble Oil & Refining Co. v. Bennett, Tex.Civ.App., 149 S.W.2d 220.

■ As to the third reason, the record fails to show, as already stated, that MPCo.'s lease is suffering any uncompensated excess drainage. It is not necessary to cite authority on this point. MPCo.'s challenge of this factual statement is predicated upon the asserted showing of the map in evidence; the contention being that the map shows that each MPCo. well is offset by a well on adjacent leases. Even if this were conceded, it does not follow that it demonstrates that there is no net drainage either in favor of or against the MPCo. lease. Offsetting is not the sole factor in determining drainage. A mere glance at

this map shows that MPCo's lease is more densely drilled than the lease to the east and that to the west.

▉ Upon the third ground attacking the order in respect to the one barrel per day extra (58 instead of 57) to WRR well No. 2, and exempting wells 2 and 3 from the seven-day monthly shut down, the record shows that these exceptions to the general proration formula were made in accordance with a general policy of the Commission to preserve flowing wells in production, and showing upon application that the wells, under the general allowable, would cease to flow unless the allowable were increased to the extent granted. It was shown that the Commission stood ready to grant like exceptions to MPCo. or any other leaseholder in the field upon application and like showing. MPCo. contends in this regard that no proper basis for the exception was shown by the record, for these reasons (substantially stated):

(1) No unusual underground conditions existed which would warrant an exception to the general rule;

(2) It was not sufficiently shown that wells 2 and 3 would not flow under the general field allowable;

(3) The evidence showed four practical methods, any one of which if adopted, would cause these wells to flow under the general field allowable; and

(4) The evidence showed conclusively that any discrimination in favor of WRR created by the exception, could be removed by allocating the entire allowable of the three wells to two, or even one well, and taking either or both of wells 2 and 3 off production.

The first reason is predicated upon that line of cases which hold that in order to sustain a permit for an additional well as an exception to the spacing rule to prevent waste it must be shown that underground conditions, peculiar to the particular lease warranting the exception existed; it being contended that no unusual underground conditions were shown, because the testimony was to the effect that the sands throughout the field were practically uniform. The fact that a well would cease to produce under the allowable, while other wells in the field continued to produce under the allowable, would, in and of itself, show a difference of some character in underground conditions and warrant an exception, if the objective

(keeping the specific well in flowing production) was a valid one. We overrule this reason.

Reason 2 is also overruled. The evidence upon this point consists of a report and accompanying charts by a Commission employee who made tests of wells 2 and 3 as a basis of the sought exceptions, and that of two experts, one for MPCo. and the other the Commission's Director of Production, giving their respective analyses of these reports and charts. We have carefully examined this testimony and have reached the conclusion that it amply sustains the finding essential to the exception. At most, we think it can only be construed as conflicting.

For the same reason we overrule reason 3. There was a great deal of testimony upon this subject. Whether any of the proposed methods, if available, would be effective in this particular field, was a subject of expert opinion, as to which the experts testifying widely differed in their views.

In view of our holding sustaining reason 4 below, we pretermit a detailed analysis of the evidence upon reasons 2 and 3.

▉ We regard the evidence in support of reason 3 as clear and without substantial contradiction to the effect that full relief could be afforded WRR by allocating its total allowable to one or two wells and taking the remaining well or wells off production. It was shown that this had been done in some other fields; and no reason was advanced why it could not appropriately be applied to this field. There was no showing that the asserted general policy of the Commission to preserve flowing wells had any reasonable factual conservation basis. We would, of course, have an entirely different situation if WRR had only one well, and the exception were essential to prevent confiscation. But by allocating its full allowable to one or two wells, no issue of confiscation is presented. It may be that upon further development sufficient ground for the exception will be disclosed. In the present state of the record the evidence is all one way in favor of reason 4.

In so far as the trial court's judgment sets aside the general field per well allowable, and enjoins its enforcement or that of similar orders, it is reversed and judgment is here rendered that MPCo. take nothing by its suit in that regard; without prejudice, however, to the right of MPCo.

to apply to the Commission for a general field proration order based upon potential instead of the existing per well allowable. In so far as the judgment sets aside that portion of the proration order which excepts therefrom WRR wells 2 and 3, and enjoins enforcement thereof, it is affirmed; without prejudice, however, to the right of WRR to make further application to the Commission for such exceptions or other relief as it may show itself entitled to. Costs of appeal are assessed against MP Co., those of the trial court against WRR and the Commission.

Reversed and rendered in part, and in part affirmed.

On Appellee's Motion for Rehearing.

We modify our former judgment in response to appellee's complaint that it limits its right of application to the Commission for a general field proration order to a potential instead of a per well basis. We did not have in mind placing any restriction either upon such right or upon the powers of the Commission. Appellee's only complaint against the general field order was that the Commission had violated its own rule which prescribed a potential formula. That complaint was predicated upon the proposition that the Commission was bound by its own rules, and could not legally transgress them. The per well formula (it was contended) did transgress its general field proration formula rule, consequently it was invalid. We naturally assumed that it was contended that the Commission could apply only its general rule (potential) formula, at least so long as that rule remained in effect. There was no attack on the rule; consequently it would seem to follow that (under appellee's contention) the rule must be applied under the only theory upon which the general field per well formula was attacked.

We see no valid reason for not adhering to our holding to the effect that appellee has not shown itself entitled, at this time, to have the general field proration order set aside, for each of the two reasons given in our original opinion.

As to the first of these reasons appellee challenges our statement that no complaint was ever made to the Commission concerning it general field proration order. We carefully perused all the evidence bearing upon this issue; and we reiterate our statement that no such complaint was ever made, and no application was ever made to the Commission to change its general field order from a per well to a potential basis. Excerpts from the evidence in support of this contention were copied in appellee's brief. We carefully considered these excerpts as well as the entire evidence regarding what transpired before the Commission, and we fail to find anything which supports appellee's contention or which militates against our statement in this regard. The complaint that the Commission was violating its own rule was made for the first time in this suit in so far as the record before us discloses.

In reply to the second of these reasons—that no injury was shown to result from not applying the potential formula—the motion reads:

"Our complaint against the per well formula of the Commission is based upon the undisputed fact that it is contrary to the Commission's own published rules; and hence irrespective of whether or not the potential method would be *beneficial* or *detrimental* to appellee, it is illegal per se. No injury need be shown in order to be relieved from unauthorized regulation."

Where there is no authority to regulate, regulation is illegal and may be prevented or ignored. But where, as here, the power to regulate exists—in fact is conceded, and invoked—and only the manner of regulation is challenged as violative of some asserted rule, we think it essential to show that some advantage would accrue or some detriment be averted by following the letter of the rule as against the formula employed. There was no attempt by appellee to show whether or what change either to appellee alone or to the field as a whole would flow from applying the potential formula as against the per well formula. The only evidence upon this subject was that introduced by appellants to the effect stated in our original opinion—which statement is not challenged.

Upon appellee's second ground of attack upon the order:

The motion levels a great deal of criticism at our summation of the effect of the evidence as to sand thickness and other underground conditions in the WRR and MPCo leases. We endeavored to give a faithful general picture of what the evidence showed in this regard. We still think we have done so by and large. We did not base our conclusions upon this evidentiary statement, however, but assumed a substantial disparity in withdrawals rel-

atively between these two leases under the per well formula of proration. We think it would serve no useful purpose to discuss the several criticisms in this respect. We note that our statement that the drainage area of a well was testified to as from 15 to 20 acres is challenged, the assertion being that the figure was "between 10 and 20 acres." We accept this version. The point is not important.

A vigorous protest is made to our holding that appellee is estopped by the agreement of its predecessors in title to complain of the disparity in withdrawals between its lease and that of WRR. An amicus curiae argument has also been filed challenging this holding. In view of the latter, and in order to remove any misapprehension as to the scope of our holding, some clarification may not be amiss.

We did not and do not hold that any agreement between leaseholders could in any way affect the powers or duties of the Commission in administering the conservation laws of the state. Nor did we nor do we hold that the Commission could bind itself by agreement in that regard. The Commission did, we think, acquiesce in the agreement, at least to the extent that it substituted for the nine-well permit, permits for only three wells. Upon the hearing as to well No. 3 the examiner's memorandum states:

"* * * the Commission granted this applicant permission to drill nine wells on the bed of the Mission River. The case was hotly protested by the offset lease and fee owners, and after the Commission granted the wells they prepared to file suit to have the permit set aside. A compromise was reached between the operator of the river bed and the owners of the offset leases whereby it was agreed that the offset operators would allow this applicant to have three drilling sites on their leases on the north bank of the river, the three wells to be started on that offset lease but to be bottomed under the river bed. On June 9, 1938, the Commission entered an order granting two wells in line with that arrangement and cancelling the former order granting 9 wells. The present application covers the third location agreed upon as a part of the compromise reached. All the interested parties were present at the hearing and there was no protest to the application."

We attach no importance whatever to acquiescence of the Commission in this agreement. It merely shows that the Commission placed no impediment in the way of executing the agreement in accordance with its express terms. The nine-well permit was canceled and permits granted for the three wells in the specific locations provided by the agreement.

Our holding that the agreement constitutes a waiver and estoppel in so far as concerns correlative rights of the parties thereto is of course limited to the particular agreement before us. Consequently fears as to its effect upon other agreements of different import (per curiam argument) are groundless.

 We can see no valid reason why adjoining lease owners may not contract with regard to their correlative rights with the same freedom, after as well as before the enactment of our conservation laws, so long as such contracts are limited to correlative rights, and in no way infringe upon the proper administration of the conservation laws of the state. To the extent of any such infringement and to that extent only they are invalid. Our conservation laws do not require development or production, they simply put limitations thereon. To the extent that they do place such limitations the theretofore unrestricted right of self-help is curtailed. Such curtailment imposes the duty to protect correlative rights—in the respect in which they curtail self-help—as far as practical, consistent with effectuating the objectives of the conservation laws. Where the parties have themselves by contract provided for such protection there is no occasion to resort therefor to the Commission. It follows that where the parties have so contracted orders of the Commission are immune from attack where the sole ground therefor is that such orders do not protect purely correlative rights. And that is the basis of the attack here in so far as concerns relative disparity in withdrawals as between these two tracts.

 That this agreement did determine the correlative rights of the parties, in so far as that could be done by contract, we think is clear. At the time of its execution there were two points of dispute between them, which concern (1) title to the river bed and (2) the number of wells the river bed tract was entitled to as a separate tract. The Commission had already granted nine wells. The agreement adjusted both controversies; it limited the number of wells that might be drilled on the river bed tract, but placed no limita-

tion on development on the MPCo tract; from these wells MPCo (lessor and lessee) was to receive a very substantial portion (6/32) of the production delivered free of operation costs; it was further provided that if WRR were required to drill additional wells on the tract MPCo's percentage of production should be raised from 6/32 to 8/32. Thus it seems that every reasonable foreseeable contingency concerning WRR lease withdrawals was provided for. It is not important whether or to what extent other considerations than adjustment of correlative rights entered into the contract. Under the spacing rule then in vogue the WRR lease as a separate tract was entitled to at least six wells. The agreement limited it to three, in the production from which MPCo lease was to share. If WRR should be required to drill additional wells to protect its interest, the proportionate share of MPCo in the production was to be augmented by 1/16. On the other hand MPCo.'s right of self-help, if such were needed, was not curtailed. Thus clearly the adjustment or protection of purely correlative rights was withdrawn from the otherwise incidental duty of the Commission and adjusted by agreement of the parties instead. The powers and duties of the Commission are legislative and administrative, except in so far as quasi-judicial function of fact finding may be incidental to its proper functions. See Sun Oil Co. v. Potter, Tex.Civ.App., 182 S.W. 2d 923. Error refused W. O. M. Its powers and duties to protect correlative rights are incidental to its functions in administering the conservation laws. To attempt to adjust purely correlative rights, where the parties have contracted in regard thereto, would require the exercise of judicial functions involved in determining the effect of the contract upon such correlative rights. We do not, of course, hold that the powers and duties of the Commission are in any manner curtailed as regards fixing relative withdrawals from the two tracts when deemed essential *in the interest of conservation.*

█ The motion states: "This Court ignores *an essential and fundamental difference* between a spacing rule and a proration formula and fails to realize that the Commission and the court have always recognized a difference between a well unit for spacing purposes and a well unit for proration purposes." In this connection our recent decision in Chenoweth v. Railroad Commission, 184 S.W.2d 711, error re-

fused W. O. M., is cited. The controversy there arose between a producer and a buyer (pipe line company) in a gas field, under a contract by which the buyer had agreed to endeavor to take gas from the seller's lands "in the same equitable or ratable portions that it takes gas from the lands and leaseholds of others" in the field. See Chenoweth v. Nordan & Morris, Tex.Civ. App., 171 S.W.2d 386, error refused W. O. M. There was a 20-acre spacing rule in effect in the field and the seller applied to the Commission for a field proration order based solely upon a per well allowable with 20 acres as a unit. As we have seen, there has been no application to the Commission for a change in the general field proration order; nor is there any showing of inequity in the per well formula as applied to the field as a whole. The contest here is between two adjacent leases; as to which the owners have already contracted. In such situation the complaining party should be relegated to his right of self-help. We are not here concerned with the powers and duties generally of the Commission to adjust relative withdrawals upon an equitable basis through proration differentials. Many "thorny problems" have arisen and others no doubt will arise from situations created by intensive drilling in other fields. We have for consideration here only the specific situation presented by the record in this case, as to which our decision is limited namely; that appellee has not shown itself entitled to have the per well formula set aside as between the two leases in order to adjust their correlative rights.

We upheld the third ground of attack upon the order upon the fourth assigned reason, our holdings overruling the first three reasons may therefore not be important. See Sun Oil Co. v. Potter, above. Since these holdings are also vigorously attacked we will briefly consider some of the grounds of attack.

█ Our holding that "the fact that a well would cease to produce under the allowable, while other wells in the field continued to produce under the allowable, would, in and of itself, show a difference of some character in underground conditions," was predicated upon what we understand to be a generally accepted theory of causation—like causes produce like effects. The effects being known and being unlike it would follow that the causes were unlike. Underground conditions might not be the sole cause for the difference in

362

known results; but in the absence of evidence of other contributing factors, the presumption of validity of the orders would favor some difference in underground conditions, if such were necessary to support its validity.

Our action in overruling reasons 2 and 3 because the evidence thereon was, at most, conflicting is attacked on the ground that we are bound by the trial court's judgment upon disputed fact issues. If we correctly construe the holding in the Marrs case on the one hand and that in the Trem Carr case (Railroad Comm. v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022) on the other, the factual findings of the Commission, when supported by substantial evidence are not subject to judicial review, except when they involve questions of invasion of constitutional rights (due process through confiscation). The record before us does not present the issue of confiscation.

It is further contended that our decision, in so far as it is predicated upon the power of the Commission to grant greater allowables to wells 2 and 3, is in conflict with our prior holding in Railroad Commission v. Fain, 161 S.W.2d 498, error refused W. O. M. That was an appeal from an order of the Commission refusing to grant an increased allowable to certain wells in order to prevent waste to the leases upon which those wells were located. It was shown, however, that to permit the increased allowables would result in waste to the field as a whole; and the holding was that it was the province of the Commission to resolve "the problem as to how conservation as to the entire field would best be subserved." We do not understand that the opinion militates against the proposition that discrimination is not shown where all wells of similar conditions are upon application and proper showing treated alike. Of course (as held in our original opinion) to sustain the exception, it is necessary to show additionally that the policy to preserve flowing wells has a reasonable factual conservation basis, and that such preservation is practical only by granting the increased allowable.

Our judgment is modified by substituting for the words "based upon potential instead of the existing per well allowable" (first sentence, last paragraph of the opinion) the words, "based upon potential or any other appropriate formula." In all other respects the motion is overruled.

Granted in part; otherwise overruled.