**RAILROAD COMMISSION et al. v. HUM-
BLE OIL & REFINING CO. et al.**

No. 9528.

Court of Civil Appeals of Texas. Austin.

March 6, 1946.

Rehearing Denied April 10, 1946.

Grover Sellers, Atty. Gen., and Fagan Dickson, Elton M. Hyder, and Ray Lynch, Asst. Attys. Gen., for appellants Railroad Commission of Texas and Attorney General of Texas.

Woodward & Gay, of Austin, Weeks, Hankerson & Surles, of Tyler, J. K. Brim, of Sulphur Springs, and Hart & Brown, by James P. Hart, all of Austin, for appellants Chas. F. Ashcroft et al.

J. A. Rauhut, of Austin, Nelson Jones, of Houston (Rex G. Baker, and R. E. Seagler, both of Houston, and Powell, Wirtz, Rauhut & Gideon, of Austin, of counsel), for appellee Humble Oil & Refining Co.

Dan Moody, of Austin, for appellees who were plaintiffs-interveners in the trial court.

**McCLENDON, Chief Justice.**

This is an oil proration suit challenging the validity of an order of the Commission (Railroad Commission of Texas), dated August 3, 1944 (copied in full in note below[1]), amending its previous order prorating the field allowable of the Hawkins field in Wood County among the wells in that field (other than marginal and high gas-oil ratio wells, not here involved), upon what is popularly termed a 50-50 basis; that is, in substance, allocating one-half the daily allowable on a per well basis and the other half upon a surface acreage basis. The spacing rule in the field (concededly proper by all parties) was twenty acres. Under this formula a well on less than one acre was given one-half the allowable of a well on 20 acres; or, stated differently, a well on a 20-acre tract could not have in excess of double the allowable of a well upon a tract of less than one acre; the acreage allowable being allocated upon the basis of 5% per acre up to and including 20 acres. The amendment of August 3, 1944, which was predicated upon the Federal P.A.W. (Petroleum Administration for War) order (M68) denying priorities for drilling material on tracts less than 40 acres, increased the acreage allowable of one well on a tract of more than 20 acres by 10% for each additional acre up to and including 40 acres. The effect of this amendment, which by its terms will expire six months after the termination of the present emergency or "the lifting of P. A. W. restrictions on drilling," was to give one well on a 40-acre tract twice the allowable of a well on a 20-acre tract or four times the allowable of a well on a tract less than one acre. This formula, except for the 40-acre amendment of August 3,

---

[1] Rule 15. (a) The proration unit shall be twenty (20) acres, and no acreage shall be assigned to a unit which is more than one thousand fifty (1,050) feet from a producing well. A tolerance of ten (10) acres on the last well on producing tracts of more than twenty acres shall be allowed where the size and shape of the tract so warrants. Where tolerance is allowed, no acreage shall be assigned to the unit or the last well which is more than twelve hundred eighty (1280) feet from the well. Units which do not contain as much as twenty acres shall be considered as fractional units. Acreage units or fractions thereof whether containing more or less than twenty acres will be considered, for proration purposes, on the basis of the actual acreage assigned to the individual unit or fractional unit.

(b) Provided, however, that for the period of the War Emergency or for the period of P.A.W. restrictions on drilling, and for a period of not to exceed six months following the termination of said emergency or the lifting of the P.A.W. restrictions on drilling, any well which, as a result of such restrictions, has been required to have available for assignment to it not less than forty surface acres may receive credit in the allocation program for the entire forty acres assigned to the well for drilling purposes so long as the two points farthermost removed from each other and contained in such drilling unit are not in excess of 2087 feet apart.

(c) The total daily field allowable as fixed by the Commission, after deductions have been made for marginal wells, wells incapable of making their allowable, and high gas-oil ratio wells, shall be distributed to the remaining wells in the field on the following basis: To each remaining well in the field X barrels of oil shall be allocated. In addition to X barrels each of these remaining wells shall receive an amount of allowable oil equal to five (5%) per cent of X barrels for each acre in the unit up to and including twenty acres.

(d) Provided, however, that for the period of the War Emergency or for the period of P.A.W. restrictions on drilling, and for a period of not to exceed six months following the termination of said emergency or the lifting of the P.A.W. restrictions on drilling, any well which may be assigned forty acres under the provisions of paragraph (b) hereof shall, in addition to the allowable accruing to such well by application of the provisions of paragraph (c) hereof, be assigned an allowable equal to ten per cent of X barrels for each acre assigned such well above twenty acres.

(e) It is the intent of this order to provide that a well to which twenty acres has been assigned shall not receive an allowable greater than twice that which has been assigned to a well on a tract less than one acre, that a well to which there has been assigned as much as thirty acres shall not receive an allowable greater than two and one-half times the allowable of a well to which has been assigned less than one acre, and that a well to which forty acres has been assigned shall not receive an allowable greater than four times that which is assigned to a well on a tract less than one acre.

It is further ordered that this cause be held open on the Docket for such other and further orders as may be necessary and supported by evidence of record. Railroad Commission of Texas.

1944, had been in effect since February 1941, shortly after the field was discovered, except for a slight amendment, not here important, made in April 1941. P.A.W. Rule M68 was promulgated in December 1941.

The suit was brought by the Humble (Humble Oil & Refining Company, the largest producer in the field) against the Commission and its members. Several royalty owners intervened as parties plaintiff adopting the pleadings of the Humble; and a number of operators owning leases on small tracts in a densely drilled portion of Hawkins townsite, intervened as parties defendant.

The Humble's petition states that the effect of the amendment, under the present field allowable, is demonstrated by the following table:

|  | .1 Acre | .5 Acre | 1.0 Acre | 20 Acres | 40 Acres |
|---|---|---|---|---|---|
| Schedule daily allowable under former order | 65 | 66 | 67 | 130 | 130 |
| Schedule daily allowable under amendment | 46 | 47 | 48 | 92 | 184 |

And further:

"The Hawkins Field in Wood County, Texas, consists of approximately 9500 productive acres and on February 1, 1945, the field contained 405 producing oil wells. The Hawkins townsite, which is divided into small lots and blocks, occupies approximately 137 acres of said field and contains 91 of said wells. Eighty-seven of these townsite wells were drilled on a total of 73.7 acres. The field outside the townsite, consisting of approximately 9363 acres, contained 314 producing oil wells on February 1, 1945. All of the wells in the Hawkins Field, including the townsite wells, produce oil from one common reservoir."

The suit is predicated upon the assertion that the order is confiscatory as between large and small tracts, against the former, which are chiefly owned by Humble, and in favor of the latter, in that it denies to Humble "a fair chance to produce its share of the oil in said common reservoir, with the result that plaintiff's properties are suffering net, uncompensated drainage to the wells of said townsite operators at the rate of approximately 2,500 barrels of oil per day."

The judgment cancelled the order appealed from and granted ancillary injunctive relief, upon jury findings upon two special issues, that if allowed to remain in effect during the life of the Hawkins field the order will:

1. Prevent Humble "from producing the recoverable oil now in place under its land, or the equivalent in kind of such oil"; and

2. Prevent the operator of wells on any tract in which any one of certain designated parties (plaintiff-interveners) "owns royalties or working interests from producing the recoverable oil now in place under such tract, or its equivalent in kind of such oil."

The Commission and defendant-interveners have appealed.

In the main the grounds of error relied upon by appellants may be substantially stated in the following four contentions; in the first of which the Commission does not join:

1. Since no issue of waste, but only that of correlative rights is involved, the Humble and others interested in the field are estopped from questioning the order, because they agreed among themselves upon the formula prescribed by the order and urged and acquiesced in its adoption by the Commission. This defense was stricken out on exception to defendant-interveners' pleadings.

2. It was error to exclude evidence of such agreement and position taken before the Commission, since it had material bearing upon the reasonableness of the order and the exercise by the Commission of its discretionary power in making it.

3. The order was not unreasonable or confiscatory, but was well within the discretionary powers of the Commission, and should have been upheld as a matter of law.

4. The proper test whether the order was confiscatory was whether it afforded Humble and others a *fair opportunity to produce,* and not (as presented in the special issues) whether it would *prevent them from producing the* recoverable oil or its equivalent underlying their lands. This

828

contention is raised in objections to the special issues and refusal of requested special issues and explanatory charges.

We are sustaining the third of these contentions; and since the other three under this holding are without controlling effect we will state our views thereon only generally.

█ As to the first: We held in Railroad Commission v. Mackhank, Tex.Civ. App., 186 S.W.2d 351, that where no issue of conservation is involved, owners of adjoining leases may execute contracts, binding between themselves, with reference to their correlative rights. The case was taken to the Supreme Court upon another issue, as to which the decision of that court was expressly limited. 190 S.W.2d 802. We refer to our opinion in that case for our views upon this question. In our opinion neither the facts alleged nor those offered in evidence in the instant case embrace the essential elements of contract or estoppel, which were clearly present in the Mackhank case. Generally speaking, and without going into extended detail, the allegations and proffered evidence were to the effect that shortly after the field was discovered and prior to the first proration or spacing order, there was a meeting at the Hawkins schoolhouse of all or practically all parties interested in the field; at which the question of the proper spacing and proration order was thoroughly discussed, and an agreement was reached substantially in accordance with the Commission order; and that this formula was presented to the Commission and acquiesced in by the Humble; its attorney making certain statements commendatory of its fairness both in the first Commission hearing, and later when the first amendment of the order was made. At a hearing before the Commission in February 1942, a petition signed by all but two of plaintiff-interveners alleged:

"Heretofore you have issued field rules for the Hawkins Field in Wood County, Texas. These rules allocate the allowable production among the wells in the field by employing a formula which it was contemplated would ultimately allow a well on twenty acres to produce about two times as much oil as a well on one acre or less in the Hawkins townsite. The order was entered by the Commission after a full hearing and after the operators and royalty owners involved had agreed in principle to such an allocation formula."

This petition was presented by Humble's attorney, who stated to the Commission at the time:

"The present basis of allocation in the field was worked out as a compromise measure between those who hold acreage in the townsite and those who hold acreage outside the townsite; and it was unanimously, as I remember, recommended to the Commission by operators in the townsite and outside the townsite. It was felt at the time that, in view of the fact that it would be necessary to drill more wells inside the townsite than outside the townsite, some concession should be made to that fact, and, as a basis, an allocation was agreed upon and was sanctioned by the Commission which give a certain percentage of the allowable of the field to the townsite area and the remaining percentage to the area outside of the townsite."

It was alleged that no substantial change in the situation affecting the propriety of the original order had subsequently taken place, other than P. A. W. Rule M68, which was taken care of in the 1944 amendment; and that investments had been made and vested rights had accrued in reliance upon the binding effect of this agreement and position taken before the Commission.

██ If for no other reason than the fact that there was no consideration for the alleged agreement, it was clearly not binding as between the parties to it, and therefore was wanting in an essential element of estoppel. And since it was not binding upon the parties, and created in them no vested right to the continuance of the formula, it furnished no valid basis for reliance upon such continuance in favor of anyone thereafter dealing with the oil properties. The Commission's power to regulate oil production in the interest both of conservation and of protecting correlative rights is a continuing one, and its proration orders are subject to change, modification or amendment at any time, upon due notice and hearing, either upon the Commission's own motion or upon application of an interested party. This principle is now so well established as to require no citation of authority. It should also be noted that each of the proration orders governing the Hawkins field contained the following provision:

"It is further ordered that this cause be held open on the docket for such other and further orders as may be necessary and supported by evidence of record."

Thus each order carried on its face notice to everyone thereafter dealing with properties in the field, that it was subject to appropriate change.

■ If, as contended by appellees, the evidence conclusively shows the invalidity of the order, then the alleged agreement and position taken before the Commission became immaterial and evidence thereof was properly excluded.

On the other hand, if the evidence was of such character as to support a finding either upholding or cancelling the order, it would seem clear that what the parties themselves thought of the propriety of the order or were willing to accept as being substantially just and fair to them, would have a material evidentiary bearing on the controversy. This would be especially true of the Humble whose interests in the field were a great deal larger than those of all the other operators combined; and who appears to be in better position to evaluate the various factors involved than anyone else. And this we think is true whether the validity of the order be tested by the substantial evidence rule or the independent judicial factual review rule. The factors involved are considered later under the third contention.

■ We also hold that the fourth contention should be sustained. As we construe the first special issue (and the same applies to the second), it called for a determination whether the Humble could under the order produce the recoverable oil in place underlying its lands, or its equivalent. In effect this was submitting the issue whether there existed, under the order, uncompensated excess drainage away from the lands of the Humble to other portions of the field. While there was sharp conflict in the testimony upon several factual issues, there was no conflict regarding the issue of substantial uncompensated excess drainage. All the witnesses testified, and appellants admit in their brief, that there was such drainage, although not conceding the extent thereof as testified to by Humble's witnesses. If therefore this issue constituted the only factor involved in determining the validity of the order, then appellee's contention that its invalidity was conclusively shown would be correct, and require an affirmance of the judgment. The proper test of the order's validity, as we construe the adjudicated cases on the subject, is whether it denies to Humble (and others) a fair opportunity to produce its recoverable oil. In determining whether the order affords such fair opportunity there are several pertinent factors other than embodied in the special issues. These are considered below, under our holding sustaining the third contention; but for which holding a remand of the cause for a new trial would be required under our holdings sustaining the second and fourth contentions.

The third contention requires a more extended consideration of the evidence than that contained in its meagre presentation above. The statement of facts is in two large volumes, 1326 of its 1375 typewritten foolscap pages constituting a question and answer transcription of the testimony of the witnesses, of whom there were six, three for appellees (Mr. Morgan J. Davis, Humble's chief geologist, Dr. Alexander Deussen, a consulting petroleum geologist, and Mr. Stuart E. Buckley, head of Humble's production research department) and three for appellants (Dr. Byron B. Boatright and Mr. Kenneth R. Teis, consulting petroleum geologists, and Mr. Jack Baumel, the Commission's Director of Production and Chief Engineer of the Oil and Gas Division). Additionally, there are many exhibits consisting of maps, charts, compilations, etc. The case was manifestly fully developed from the viewpoint of a factual presentation of everything actually known or which apparently could have been known regarding the field up to the time of trial, having any bearing upon the issues involved in the several contentions of the parties. While we shall endeavor to give an overall picture of the situation with sufficient specification to a clear understanding of what we hold the controlling issues in the case, and shall point out the major conflicts in the testimony, it will not be necessary, in our view of the case, to set forth the evidence or even its substance in any extended detail.

The Hawkins structure is a large dome about 4.8 miles long (NE–SW) and 4 miles wide (E–W). It is highly faulted. One large fault on the E. side of the field has a maximum displacement of about 400 feet and divides the field into two areas known as East and West Hawkins. There appears to be no substantial migration between the two areas. The other faults are of varying displacement, some of them 100 feet and more. The production is from the Woodbine sands about 4,000 feet below sea level, or about 4,400 feet below the surface. The

woodbine is divided between two horizons, the upper known as Lewisville and the lower as Dexter. Both horizons contain oil, but the Lewisville is largely impervious shale interspersed with oil producing sand lenses. The Dexter is interspersed with impervious shale lenses. The average producing sand thickness in the Dexter is about 107 feet. At about 4,400 feet subsea level is a tarry or asphaltic substance from three to ten feet thick, which separates the underlying water from the oil producing sands. The boundary between the Lewisville and Dexter follows the general domal outline of the structure and intersects the water level near the edges of the field, beyond which intersection and extending around the outskirts of the field production is only from the Lewisville. So far there is no water drive in the West Hawkins areas, due to this tarry layer. There is a water drive in the East Hawkins area, and such is the case in all other Woodbine fields throughout East Texas. At the top of the dome and overlying the oil producing sands is a gas cap. In the West Hawkins the only natural lifting power of the oil in production is from gas pressure in the expansion of this gas cap and the release of gas in solution, there being no water drive in this area. Near the center of the field is a large free gas area from which there is no oil production. Several wells drilled in the producing area were dry holes. The townsite contains 137 acres, 63.26 is owned by T. & P. Ry Co., and is under lease to Humble. It has five wells, no more being authorized. The remaining 73.74 acres is cut up into small tracts separately owned and has 87 producing wells. The rest of the field, with negligible exception, consists of large tracts. These 87 wells had been drilled prior to the effective date of Rule M68, up to which time the Humble had been diligent in drilling its properties in accordance with the 20-acre spacing, but had not completed such drilling. As a result there were a number of wells it was cut off from drilling because of failure to get priorities for material under this rule. It was upon showing of such inability that the 40-acre amendment to the proration order was passed in August 1944. The Commission had granted no exceptions to the spacing rule, except those that were required to protect vested rights; that is one to each segregated tract, however small; but not more than one well on any such tract. Each of the wells in the densely drilled 73.74 acres was drilled in accordance with this rule.

The overall general picture regarding recoverable reserves and drainage as presented by Mr. Davis was that Humble's properties contained 76.5% of the recoverable reserves of the entire field; whereas, under the proration order in issue it was allowed only 71.4% of such recoverable reserves, which, if continued during the rest of the life of the field (estimated at about 27 years) would result in drainage from Humble properties to the thickly drilled portion of the townsite of some 30,000,000 barrels of Humble's oil. Neither the method by which nor the data upon which this calculation was based is questioned; but only the variableness of the conclusions or estimates deduced therefrom. The method was to take an estimated percentage of the oil in place, as the amount of recoverable oil, either under the whole field or under any particular tract therein. The first step in this method was to estimate the total volume of producing sand expressed in acre feet per surface acre. The data from which this estimate was made was derived from electrical logs of each well, called Schlumbergers. Since these logs only show the sand thickness in the area occupied by the well bore, a relatively insignificant portion of the area involved, it is necessary to make the estimate by averaging the sand thickness between wells from the thicknesses shown by the adjacent well logs. This is the only possible method, and it is concededly subject to wide variation from actual underground conditions, largely accentuated by the unusually faulted condition of the field. Mr. Davis testified that the general average would be approximately correct, for the reason that overestimate in one area would be compensated by underestimate in another. On the other hand, Mr. Teis testified that due to the highly faulty character of the field this averaging involved a substantial probability of error. He illustrated this by calculations from logs in a 20-acre area in the townsite having 26 wells. By taking only one central well in the tract and one well on each abutting 20 acres, and then taking all the 26 wells and adjoining offset wells, there was a difference of 15% in the result. As to this particular tract the smaller spacing gave the larger figure. He testified, however, that there was no way of determining whether the figure would be the same or

reversed, if the method could be applied to the 20 or 40-acre drilled tracts.

The percentage of recoverable oil of the oil in place, was calculated from estimates of the following factors: sand porosity; shrinkage or saturation; viscosity of the oil. Sand porosity involved two factors, the actual percentage of void between the sand grains less the percentage of connate water. The first of these factors involved a laboratory test not necessary to detail, of a small sample of sand, and so far as the particular sample was concerned the test was reasonably accurate. However, all witnesses agreed that the amount of connate water was largely a guess. Mr. Buckley testified that the percentage of connate water had no appreciable bearing upon the amount of recoverable oil except where a very high percentage (about 80%) was reached. No other witness corroborated this testimony, and it was expressly contradicted by Mr. Teis. There was a wide variability in permeability and viscosity throughout the field; and it was admitted by Humble's witnesses that estimates based upon some of these factors were subject to wide margins of error. Mr. Davis testified, however, that any such errors would be mutually compensatory under general average of the entire field.

Another substantial conflict was in estimating productivity during the life of the field. Humble's witnesses testified that they did not believe there would ever be a water drive in West Hawkins, and that the townsite 73.74 acres would be productive during the entire life of the field. Appellees' witnesses believed, on the contrary, that there would later be a water drive; but that regardless of a water drive, the life of the townsite 73.74 acres would be shortened below that of the rest of the field by some ten years due to its position on the structure, and the heavier withdrawals, which would accelerate the gas encroachment and result in earlier drowning out of that area. It was conceded, however, by Mr. Davis that no other field in the Woodbine had been drilled and produced under the same formula, or had been exhausted, and that only experience could demonstrate what would actually happen in these regards.

It was shown that the original cost of drilling and equipping a producing well in the field was approximately $20,000; that a spacing pattern of 10 acres would require Humble to drill some 500 wells in addition to those required under the 20-acre spacing; or a total original cost of some $10,000,000. There was no showing as to the operation cost of wells in production. There was no attempt on the part of appellees to show what would be the result upon the field of its development without restriction as to well spacing or production; what would probably be either the total production from the large and small leases or the relative amount of such production as between such leases or as compared with the formula in issue. Dr. Boatright testified in this regard:

"In view of the fact that the townsite sand has as good or better characteristic as the balance of the field has a much thicker sand section than the average of the field, and has a potential history that is better than the average of the field, and a much greater percentage of the wells than they are now getting of the production, I don't think there is any question but what under unrestricted production the township would produce more oil if the restrictions were taken off than it would produce under the present Railroad Commission order."

He testified further that he could not estimate the recovery from any particular lease, without knowing what Humble's drilling program would be under such circumstances.

It will be observed that the proration formula as to acreage is based upon surface acreage and not upon acre feet of producing sand, or recoverable reserves. Mr. Baumel testified that such a proration formula would be impractical. No suggestion was made by any of the appellees that the formula be changed from a surface acreage basis to an acre foot of sand basis. Their only suggestion as to a proper formula was to change the relative percentage from the 50-50 basis by increasing the acreage allowable to say 60% and reducing the per well allowable to 40%, which, the evidence showed could be done without waste. There was no showing as to the minimum allowable essential to keep wells in production, or to make such production profitable.

It was also shown that the total well potentials of Humble's wells was only 59.65% of the total well potentials in the field; whereas Humble was getting under the formula 71.4% of the total allowable. The Humble contends that these figures have no bearing on the controversy for the reason that the potentials were not taken

on "open flow tests", but only for the purpose of determining whether a given well would produce its allowable. The fact that Humble has only 61.82% of the total wells in the field while given 71.4% of the allowable is also discarded by Humble as having no bearing on the controversy.

While we have given in main outline the principal points of difference in the testimony between the experts introduced by the respective parties, we are assuming, for our present purposes, the correctness of the facts and the estimates and conclusions drawn therefrom as testified to by Humble's witnesses.

The general legal principles applicable to the factual situation here presented, we believe, are now well settled by the adjudicated cases. They may be briefly summarized as follows:

■ Oil in place belongs to the owner of the soil, but due to its fugacious nature is subject (absent conservation restrictions) to the unlimited right of capture. Both this ownership (title) and unlimited right of capture are property rights, and neither can be infringed except in a proper administration of our conservation laws. See Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393; Corzelius v. Harrell, Tex.Sup., 186 S.W.2d 961.

■ Rule 37 (spacing rule) and the exception thereto to prevent confiscation of property (as also waste, not here involved) as well as the limitation of production through proration, have been uniformly upheld, as valid exercises of the police power in the interest of conservation of a natural resource. Any restriction upon the number of wells drilled or the amount of production therefrom is essentially an infringement upon the right of private property, and can only be upheld as a conservation measure. In the exercise of this right of curtailment it is generally recognized that the rules and regulations adopted must, as far as practical, and within reasonable limitations, afford the several property owners a fair opportunity to produce the recoverable oil underlying their lands or its equivalent.

■ As a corollary to these rules, it is held that the owner of an "involuntarily" segregated tract cannot be denied the right to drill at least one well on his tract however small it may be. From which it would seem that his allowable can not be cut down to the point where his well would no longer produce, (See Railroad Commission v. Mackhank, Tex.Sup., 190 S.W.2d 802) nor below the point where it could not be drilled and operated at a reasonable profit.

There are certain natural advantages which the small tracts have over large tracts in unrestricted production; and we think these natural advantages may properly be taken into consideration in administering the conservation laws. Oil in place, though owned by the soil owner, cannot be produced except at great cost depending upon the depth from which it must be mined. This cost places practical limitations upon the right of capture which are as cogent as any other involved factor. It is not only by no means certain, but hardly within the range of reasonable probability, that in this field, where the small tracts are all concentrated in one small area, the Humble would go to the expense of drilling sufficient offset wells to prevent the townsite owners from producing as much as they will produce under the order in suit. Certainly they would not drill to the same density as the townsite tract. Whether this would be necessary to prevent all drainage does not appear. Mr. Davis testified that the townsite was draining the remote areas of the field. The mere drilling of offset wells to those in the townsite would accelerate this drainage. Just what effect unrestricted production would have on the field was not shown and probably could not be shown. However, the restriction in production and the retarded orderly withdrawals from the field, were in the interest of conservation, preventing waste, and effecting a greater ultimate recovery than would be had under unrestricted production. The large tract owners would share the larger in this benefit. The evidence does not afford the means of evaluating these factors and probably means for such evaluation could not be obtained. That they do afford a substantial advantage to the large tract owners we have no doubt. Another advantage of proration is restricting production to market demand. It is a matter of history that unrestricted production in the East Texas field reduced the market price of oil to 8 cents per barrel.

Independently of these considerations, however, there is another factor compensatory of the disparity in withdrawals between large and small tracts, the means for

evaluating which are much more tangible; namely, the saving in cost of production under the 20-acre spacing pattern and proration order. On a 20-acre tract the cost of production of a given amount of oil is only half of that on a tract of less than one acre, which latter is four times the cost of a 40-acre tract. As illustrative of the effect of this factor the evidence shows that the saving in original cost, exclusive of operation cost, to the Humble alone between drilling on a 20-acre spacing pattern and on a 10-acre spacing pattern would amount to approximately $10,000,000. To evaluate this saving it would have to be capitalized at a reasonable rate of interest and amortized over the period of the life of the field (27 years). Against this investment, at most, is the 5% of additional recoverable reserves (30,000,000 barrels of oil) the production of which would be spread out over the same 27 years.

■ The conservation orders of the Commission are presumptively valid, and before they can be set aside by the courts, their invalidity must clearly be shown. Judge Sharp expresses this rule in Corzelius v. Harrell, Tex.Sup., 186 S.W.2d 961, 967, as follows:

"The Railroad Commission is not required in administering the oil and gas statutes to be absolutely accurate in its rules and orders. This would be impossible. It is the duty of the Commission to treat all interested parties justly and impartially, and the actions and rulings of the Commission in attempting to accomplish such results will not be disturbed by the courts unless such rules or orders are clearly illegal, unreasonable, or arbitrary. The power to make rules rests exclusively with the Railroad Commission."

See also Potter v. Sun, Tex. Sup., 189 S.W.2d 482.

■ The responsibility for the proper administration of the conservation laws rests primarily with the Commission. What factors shall be considered, and their proper evaluation are matters exclusively within the Commission's discretion and not subject to judicial review, so long as they bear a reasonable relation to the subject matter of the order. In the Brown case, above, Judge Sharp used this language [126 Tex. 296, 87 S.W.2d 1070]:

"There are many factors, facts, and circumstances, which we shall not undertake to detail here, in each case and in each hearing, which must be considered, weighed, and given effect, in the fair and reasonable administration of such laws, rules, and exceptions. All questions of fact are primarily for the commission to determine."

The following is from Chief Justice Alexander's opinion in the Marrs case (Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941, 950).

"The responsibility rests with the Commission to devise some scheme of proration that will conserve the oil in the field in question, and at the same time will be fair and just and will not deprive petitioners of their property. There are many and varied methods that may be adopted by the Commission to accomplish this purpose. This necessarily involves the exercise of the discretion that has been committed by the Legislature to the Commission, and it would amount to a usurpation of the Commission's power by the court, for the court to undertake to prescribe the terms of such an order. As heretofore stated by this Court, in passing on the validity of any scheme that may be worked out by the Commission for the handling of this problem, a reasonable margin will be allowed for differences in opinion and errors in judgment."

And this from Judge Hickman's opinion in the recent case of Railroad Commission v. Mackhank, Tex.Sup., 190 S.W.2d 802, 804:

"The Court cannot strike down an administrative order on the ground that the evidence heard by the Court indicated that a more equitable one could be entered."

■ It has never been held that recoverable reserves constitutes the only factor to be considered in determining the validity of a proration order. And so far as we are aware no proration order has ever been made in which the allowable has been allocated in proportion to the recoverable reserves. The only evidence upon this subject was to the effect that allocation upon such basis would be impractical. Nor is it contended by appellees that such basis should be adopted. As we understand their contention, there is no complaint of the order on the ground that it divides the total allowable upon a per well and surface acreage percentage basis; but only that the 50-50 formula does not give them their share of the recoverable reserves.

We believe the Marrs case is the only one in which the validity of an oil proration order allocating the field allowable has ever been adjudicated by our Supreme Court. Other than the Danciger case (Danciger Oil & Refining Co. of Texas v. Railroad Commission, Tex.Civ. App., 49 S.W.2d 837), the earlier proration cases were brought in the federal courts. The Danciger case was dismissed by the Supreme Court without adjudication of the merits. 122 Tex. 243, 56 S.W.2d 1075. Well potential was recognized as an appropriate factor to be considered in determining the validity of a proration order in the Marrs case; and proration orders based on well potentials have been upheld by the federal courts. See Danciger Oil & Refining Co. of Texas v. Smith, D.C., 4 F.Supp. 236, 237, wherein Judge Hutcheson, writing for a three-judge court, said:

" * * * unlike the orders in those cases which apportioned the allowable to the field on a per well basis rather than in accordance with the potential of the wells, so as to give each well reasonably its proportion of the allowed production, this order distributed the allowable on a potential basis in an effort to fairly allocate to each producer that portion of the production which the situation and nature of his properties entitles him to have. It is therefore plain that it cannot be said that there is anything arbitrary or unreasonable on the face of the order, either in the amount of production to which a particular field is limited or in the method of its distribution."

As above shown appellees contend that potentials can not be considered in this case because not properly taken. Conceding this point arguendo; can it be reasonably said that appellees have established the invalidity of the order when no effort has been made by them to have the effect of this factor developed. See opinion of this court in Railroad Commission v. Mackhank, Tex.Civ.App., 186 S.W.2d 351.

Waving other issues aside, however, and considering only the compensatory effect of reduced drilling cost, and this independently of reduced operating cost, we think the order was well within the discretionary powers of the Commission in making it.

In reaching this conclusion we have assumed that the independent judicial factual review rule, laid down in the Marrs case applies, at least in proration cases;

and this even to the extent of passing upon the conflicting views and theories of expert witnesses.

It is interesting to note, however, that, although the same issue of confiscation is involved in Rule 37 cases where the permits are based upon the exception "to prevent confiscation of property," the substantial evidence rule has been uniformly applied. The latest expression of the Supreme Court upon this subject is that contained in the following language from Judge Sharp's opinion in Potter v. Sun, above [189 S.W.2d 484]:

"The decision in this case may be placed on the rule that if there is any testimony of probative force to sustain the order of the Railroad Commission and the judgment of the trial court, it is the duty of the courts to uphold such order and judgment, unless they are clearly illegal, unreasonable, or arbitrary."

It would appear that in dealing with an oil field consisting of a common pool it is essential to have uniformity in geological theory applied throughout the field. The Commission would clearly not be warranted in accepting the theory of one set of experts in passing upon the rights of one leaseholder, and rejecting that theory and adopting that of another set of experts in passing upon another's rights. It is the view of the writer that to this extent, at least, the Commission's discretionary powers should not be subject to judicial review, and the substantial evidence rule should apply.

The following is from the Federal Supreme Court's opinion in the first Rowan & Nichols case, Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 1024, 84 L.Ed. 1368:

"Certainly in a domain of knowledge still shifting and growing, and in a field where judgment is therefore necessarily beset by the necessity of inferences bordering on conjecture even for those learned in the art, it would be presumptuous for courts, on the basis of conflicting expert testimony, to deem the view of the administrative tribunal, acting under legislative authority offensive to the Fourteenth Amendment."

The trial court's judgment is reversed and judgment is here rendered for appellants.

Reversed and rendered.